POMERANTZ LLP
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Attorney for Plaintiff*

*[Additional Counsel on Signature Page]*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HAMZA ELKHODARI, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>UNICYCIVE THERAPEUTICS, INC., SHALABH GUPTA, and JOHN TOWNSEND,<br><br>Defendants. | Case No. 3:25-cv-06923-JD<br><br><u>CLASS ACTION</u><br><br>AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><u>DEMAND FOR JURY TRIAL</u> |

Lead Plaintiff Andrew Coleman ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Unicycive Therapeutics, Inc. ("Unicycive" or the "Company"), analysts' reports and advisories about the Company, documents obtained through

Freedom of Information Act ("FOIA") requests, and information readily obtainable on the Internet. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Unicycive securities between March 29, 2024 and June 27, 2025, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2. Unicycive is a clinical-stage biotechnology company that purports to identify, develop, and commercialize therapies to address unmet medical needs in the U.S. The Company's lead therapy under development is oxylanthanum carbonate ("OLC"), a next-generation phosphate binder for the treatment of hyperphosphatemia in chronic kidney disease ("CKD") patients on dialysis. OLC is one of two drugs Unicycive has under development, and the closest to commercialization. Unicycive has never had an approved drug on the market and has incurred significant operating losses since inception.

3. Before it can market and sell OLC, Unicycive has to obtain FDA approval of the drug via a §505(b)(2) New Drug Application ("NDA"), which is supposed to contain data demonstrating the drug's efficacy and safety from clinical trials and the ability of manufacturing facilities to mass produce the drug in accordance with FDA's Current Good Manufacturing Practices regulations ("cGMP"). 21 U.S.C. 355(b); 21 CFR 314.50(d).

4. Indeed, an integral part of the NDA is the section regarding the drug's chemistry, manufacturing, and controls ("CMC"), which is intended to demonstrate to the FDA that the proposed manufacturing processes, facilities, and control systems are capable of consistently producing a drug product that meets required specifications, including those relied upon during clinical trials.

5. If the drug application fails at any one of these points, then the FDA issues a Complete Response Letter ("CRL"). Pursuant to federal regulations, a CRL states that FDA will not approve the application in its present form, denotes the deficiencies the FDA has identified in the application, and, where possible, provides recommendations of corrective actions the sponsor can take to rectify its mistakes.

6. At all relevant times, Defendants consistently touted the prospects of a New Drug Application ("NDA") for OLC for the treatment of hyperphosphatemia in CKD patients on dialysis (the "OLC NDA"), assuring investors and analysts of the Company's readiness and ability to satisfy the U.S. Food and Drug Administration's ("FDA"), *inter alia*, manufacturing compliance requirements.

7. Unbeknownst to investors, Unicycive's purported manufacturing readiness depended on a third-party manufacturer with a long-standing and escalating history of serious regulatory compliance failures. Unicycive relied on Shilpa Medicare Ltd. ("Shilpa") to perform critical CMC functions in support of the OLC NDA and potential commercial supply. As detailed below, the FDA admonished Shilpa repeatedly for systemic violations of cGMP requirements beginning in 2017, issued a formal Warning Letter to Shilpa in 2020 citing repeat violations, and placed Shilpa on an FDA Import Alert in 2021 that barred most of its drug products from entering the United States. These actions reflected unresolved, facility-level quality failures—not isolated

or product-specific issues—such that the Import Alert remained in effect throughout the Class Period and to date.

8. In September 2024, Unicycive announced that it had submitted the OLC NDA to the FDA. At that time, and throughout the Class Period, Defendants knew or recklessly disregarded that the systemic and persistent regulatory compliance issues that Shilpa had failed to adequately remediate since 2017 materially increased the risk that the FDA would issue a CRL rather than approve the OLC NDA.

9. Despite these material regulatory risks, Defendants repeatedly falsely represented that Unicycive was prepared to satisfy FDA manufacturing requirements and portrayed the risk of regulatory delay or rejection as hypothetical. Defendants failed to disclose that the FDA's approval determination for OLC depended on the compliance status of a manufacturer with a well-documented history of un-remediated violations, rendering the risk of a manufacturing-related delay or rejection materially greater than Defendants had led investors to believe.

10. Throughout the Class Period, Defendants made materially false and misleading statements concerning Unicycive's regulatory progress toward approval of the OLC NDA, including its manufacturing readiness and the risk that FDA would delay or refuse approval. Specifically, Defendants: (i) repeatedly portrayed manufacturing- and CMC-related risks as speculative or hypothetical when they had already materialized; (ii) represented that Unicycive was prepared to satisfy the FDA's manufacturing requirements; (iii) overstated the OLC NDA's regulatory prospects and approval timeline; (iv) failed to disclose that Unicycive's manufacturing readiness depended on Shilpa, a third-party manufacturer with a longstanding and escalating FDA enforcement history; and (v) failed to disclose that, as a result of Shilpa's regulatory status, Unicycive faced a materially heightened risk that the FDA would issue a CRL rather than approve the OLC NDA.

11. On June 10, 2025, Unicycive issued a press release "announc[ing] an update on its [NDA] for [OLC] to treat hyperphosphatemia in patients with [CKD] on dialysis." Therein, the Company disclosed that the FDA "had identified deficiencies in cGMP [current good manufacturing practice] compliance at a third-party manufacturing vendor"—specifically, a third-party subcontractor of Unicycive's contract development and manufacturing organization ("CDMO")—"following an FDA inspection" and that, "given the identified deficiencies, any label discussions between the FDA and the Company are precluded."

12. On this news, Unicycive's stock price fell $3.68 per share, or ***40.89%***, to close at $5.32 per share on June 10, 2025.

13. Then, on June 30, 2025, Unicycive issued a press release announcing that the FDA had issued a Complete Response Letter ("CRL") for the OLC NDA, citing the previously identified cGMP deficiencies at the third-party subcontractor of its CDMO.

14. On this news, Unicycive's stock price[1] fell $2.03 per share, or ***29.85%***, to close at $4.77 per share on June 30, 2025.

15. At minimum, the foregoing developments substantially delayed approval while Unicycive addressed the CMC issues the FDA identified and resubmitted the OLC NDA.

16. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

[1] On June 18, 2025, Unicycive effectuated a 1-for-10 reverse stock split, and the Company's common stock began trading on a split-adjusted basis on June 20, 2025.

## JURISDICTION AND VENUE

17. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

18. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

19. Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Unicycive is headquartered in this District, Defendants conduct business in this District, and a significant portion of Defendants' activities took place within this District.

20. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

21. Plaintiff, as set forth in the Certification filed previously with this Court (Doc No. 14-4), acquired Unicycive securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

22. Defendant Unicycive is a Delaware corporation with principal executive offices located at 4300 El Camino Real, Suite 210, Los Alto, California 94022. The Company's common stock trades in an efficient market on the Nasdaq Capital Market ("NASDAQ") under the ticker symbol "UNCY."

23. Defendant Shalabh Gupta ("Gupta") has served as Unicycive's Chief Executive Officer at all relevant times. Defendant Gupta is also the Company's founder and Chairman of its Board of Directors.

24. Defendant John Townsend ("Townsend") has served as Unicycive's Chief Financial Officer at all relevant times.

25. Defendants Gupta and Townsend are collectively referred to herein as the "Individual Defendants."

26. The Individual Defendants possessed the power and authority to control the contents of Unicycive's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of Unicycive's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Unicycive, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

27. Unicycive and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

28. Unicycive is a clinical-stage biotechnology company that, according to its most recent 10-K for the year ended December 31, 2024 (2024 10-K), was established in 2016 "to

create a streamlined and efficient drug development platform capable of accelerating the advancement of promising therapies from discovery to commercialization."

29. Since inception, and to date, the Company has not generated any product revenue and has incurred significant operating losses. Moreover, Unicycive is a small company. According to its 10-K filings, the Company only had between fourteen and twenty-two full-time employees during the March 28, 2024 to March 28, 2025 timeframe.

30. Unicycive's lead drug candidate is OLC, an investigational oral phosphate binder that purportedly treats hyperphosphatemia in CKD patients on dialysis. The Company purchased OLC (previously referred to as "Renazorb") from Spectrum Pharmaceuticals in September 2018.

31. The only other drug Unicycive has under development is UNI-494, which is intended to treat acute kidney injury. However, OLC is substantially further along in the regulatory approval process than UNI-494.

32. Unicycive has stated that it is focused initially on gaining approval in the U.S. before partnering with global biopharmaceutical companies.

33. On September 3, 2024, Unicycive announced that it had submitted its NDA for OLC to the FDA purportedly based on data from three clinical studies, multiple preclinical studies, and ***the CMC data***. The Company announced a Prescription Drug User Fee Act ("PDUFA") date, i.e. the target deadline by which the FDA would make a decision on the OCL NDA, of June 28, 2025.

34. At all relevant times, Defendants consistently touted the prospects of the OLC NDA, assuring investors and analysts of the Company's readiness and ability to satisfy, *inter alia*, the FDA's manufacturing compliance requirements, and characterizing any related risks as purely hypothetical. As explained below, the risk to the approvability of the NDA was not hypothetical in the least. Unicycive engaged a manufacturer, Shilpa Medicare Ltd., with well-documented

systemic regulatory compliance deficiencies that have persisted since 2017 and ultimately resulted in a near complete ban on the import of drugs that Shilpa manufactures. Defendants thus knew, or at minimum recklessly disregarded, that the OLC NDA faced a material risk of substantial delay or outright rejection.

35. Defendants' statements misled investors, not because they denied the possibility that the FDA would reject the OLC NDA, but because they failed to disclose that they faced a materially elevated probability that the FDA would reject the NDA due to Shilpa's known, unresolved cGMP issues. Significantly, it is irrelevant whether Shilpa' deficiencies pertained directly to OLC; under the relevant regulatory framework, cGMP deficiencies at the manufacturing facility generally place any NDA associated with that facility at risk.

36. Having chosen to speak about manufacturing readiness, regulatory progress, and the risk of FDA action, Defendants had a duty to disclose material facts necessary to prevent those statements from misleading investors—specifically, that FDA approval could be precluded based on existing facility-level compliance risks.

**The FDA Approval Process**

37. Under the Federal Food, Drug, and Cosmetic Act (the "FDCA"), the FDA is tasked with ensuring that drugs and devices are safe and effective for their intended uses. 21 U.S.C. §§ 351-360.

38. Companies seeking to begin a clinical investigation of a new drug must submit an Investigational New Drug Application ("IND") to the FDA. 21 C.F.R. § 312.20. The IND application would contain, inter alia, information pertaining to the composition, manufacturer, stability, and controls used for manufacturing the drug substance and the drug product.[2] This

[2] https://www.fda.gov/drugs/types-applications/investigational-new-drug-ind-application.

information is assessed to ensure that the company can adequately produce and supply consistent batches of the drug.[3] An IND goes into effect 30 calendar days after FDA receives the IND, unless the FDA places the IND on a clinical hold (21 CFR 312.40(b)). If the FDA does not place a clinical hold, then clinical trials can commence.

39. A clinical investigation is generally divided into three phases, though there is the potential for certain phases to overlap. *See* 21 C.F.R. § 312.21. Phase 1 includes the initial introduction of the drug into humans, and generally involves 20 to 80 patients. 21 C.F.R. § 312.21(a). The goals of Phase 1 are to determine the most frequent side effects, and how the drug is metabolized and excreted. These goals include pharmacokinetic and, where appropriate, pharmacodynamic assessments. Phase 2 includes controlled clinical studies conducted to evaluate the effectiveness of the drug for a particular indication in patients with the disease or condition under study and generally involves no more than several hundred subjects. 21 C.F.R. § 312.21(b). Phase 3 includes expanded controlled and uncontrolled trials performed after preliminary evidence suggesting effectiveness of the drug has been obtained, and usually includes several hundred to several thousand subjects. 21 C.F.R. § 312.21(c).

40. After the three clinical trial phases are complete, a sponsor may request a "pre-NDA meeting" with FDA prior to submission of a New Drug Application ("NDA") to exchange information about the proposed drug marketing application. 21 C.F.R. § 312.47(2). This pre-NDA meeting provides an opportunity for the sponsoring company to: [1] "uncover any major unresolved problems," [2] "identify those studies that the sponsor is relying on as adequate and well-controlled to establish the drug's effectiveness," [3] "identify the status of ongoing or needed studies adequate to assess pediatric safety and effectiveness," [4] "acquaint FDA reviewers with

[3] *Id.*

the general information to be submitted in the marketing application (including technical information)," [5] "discuss appropriate methods for statistical analysis of the data," and [6] "discuss the best approach to the presentation and formatting of data in the marketing application." 21 C.F.R. § 312.47(b)(2).

41. Pre-NDA meetings also routinely address CMC issues, including the adequacy of manufacturing processes, control strategies, and the readiness of proposed manufacturing facilities for pre-approval inspection (see below).

42. Once a pre-NDA meeting is held, the sponsoring company may then formally request FDA approval of a drug for marketing in the United States through submission of an NDA. 21 C.F.R. § 314.50.

43. In 1984, Congress passed The Drug Price Competition and Patent Term Restoration Act of 1984 ("Hatch-Waxman Amendments") to the FDCA, Pub. L. No. 98–417, 98 Stat. 1585 (1984). The Hatch-Waxman Amendments were intended to balance the competing interests in the pharmaceutical industry of inducing pioneering research and development of new drugs, and to enable competitors to bring low-cost, generic copies of those drugs to market.

44. The Hatch–Waxman Amendments require drug manufacturers seeking to market a new drug to first obtain FDA approval via one of three different application pathways: (1) a full New Drug Application ("NDA") or 505(b)(1) NDAs; (2) an Abbreviated New Drug Application ("ANDA") or 505(b)(j) ANDA; or (3) an intermediate process known as a Section 505(b)(2) NDA.

45. Sponsors submit NDA's pursuant to Section 505(b)(2) of the FDCA when seeking FDA approval of new or improved formulations of previously approved drugs. As the Company explained in its 2024 10-K (at 24), "Section 505(b)(2) permits the filing of an NDA where at least some of the information required for approval comes from studies not conducted by or for the

applicant and for which the applicant has not obtained a right of reference from the data owner." Unicycive utilized the 505(b)(2) regulatory pathway for OLC utilizing data from a previously approved drug called Fosrenol.

46. Notwithstanding reliance on prior clinical data, a 505(b)(2) NDA still must independently demonstrate that the proposed manufacturing processes and facilities comply with cGMP requirements. 21 C.F.R. §§ 314.50(d)(1)(i), 210–211.

47. The FDA has 60 days after an NDA is received to decide whether to file the NDA for review. 21 C.F.R. § 314.101(a). Where the FDA finds no basis to refuse the filing of an NDA, the FDA will file the NDA for substantive review. 21 C.F.R. § 314.101(a), (a)(2). Once the review is complete, the FDA will either approve the NDA or issue a complete response letter rejecting the application. 21 C.F.R. § 314.110(a). The FDA will only approve an NDA after determining that the drug meets statutory standards for safety and effectiveness, that the methods, facilities, and controls used for manufacture comply with cGMP, and that the proposed labeling is adequate. 21 C.F.R. §§ 314.105(c); 314.125(b)(1), (b)(13).

48. Once the FDA has accepted an NDA, it may refuse to approve it for a variety of substantive reasons. If the FDA determines that it will not approve an NDA in its present form, it will send the applicant a Complete Response Letter ("CRL") that describes the deficiencies in the application and, where possible, provides recommendations for achieving approval.

49. Following the submission of an NDA, the FDA conducts Pre-Approval Inspections ("PAIs") of manufacturing sites listed in the NDA. PAIs assess whether the facilities, equipment, manufacturing processes, quality systems, and controls used to manufacture the drug

substance and drug product comply with cGMP and are capable of consistently producing product meeting specifications.[4]

50. Where the FDA identifies significant cGMP deficiencies during a PAI, FDA may delay approval, require remediation, or issue a CRL regardless of the adequacy of the clinical data. 21 C.F.R. § 314.125(b)(1), (b)(13).

51. Defendants acknowledged their understanding of the significance of PAIs in Unicycive's filings wherein they stated that, "the FDA will inspect the facility or the facilities at which the drug is manufactured. The FDA will not approve the NDA unless it determines that the manufacturing process and facilities are in compliance with cGMP requirements and are adequate to assure consistent production of the product within required specifications, and the NDA contains data that provide substantial evidence that the drug is safe and effective for the labeled indication." *See, e.g.,* 2024 10-K, at 23.

52. In addition to demonstrating safety and effectiveness, FDA approval of a New Drug Application depends on whether the manufacturing processes, testing, and facilities identified in the application comply with cGMP requirements and are capable of consistently producing product meeting specifications. Unicycive does not own or operate its own manufacturing facilities and thus has to utilize contract manufacturing organizations ("CMOs"). Toward that end, as Defendants disclosed, Unicycive entered into a Manufacturing and Supply Agreement (the "Agreement") on October 31, 2020[5] with Shilpa, pursuant to which Shilpa

[4] *See, e.g.*, https://www.fda.gov/files/drugs/published/FDA%E2%80%99s-Pre-Approval-Inspection-(PAI)-Program-and-How-to-prepare-for-a-successful-outcome.pdf

[5] The Agreement is available at sec.gov/Archives/edgar/data/1766140/000121390024068565/ea021067201ex10-1_unicycive.htm.

provided "development, manufacturing, supply and other CMC-related services" related to the development and commercialization of OLC.

53. Under the Agreement, Shilpa agreed to provide development, manufacturing, supply, and other CMC-related services related to the development and commercialization of Renazorb.[6]

54. To oversee the contract's performance, Unicycive and Shilpa formed a joint committee containing one senior member from each company with the "requisite experience and knowledge[] to address all issues that may arise under . . . this Agreement."[7]

55. The Agreement gave Unicycive significant oversight rights. Shilpa was required to provide written notice of any testing failure or other damage to OLC shipments, and Unicycive had the right to audit and inspect any Shilpa facilities, "including but not limited to ***all compliance and other filings applicable to Regulatory authorities***."[8]

56. Indeed, the Agreement *required* Shilpa to "***immediately*** notify [Unicycive] of any inspections performed by any Regulatory Authority at any of the aforementioned facilities ***and the results of such inspections***."[9]

57. The Agreement also required Shilpa to "provide all necessary data, reports, plans and documents" required by Unicycive for seeking regulatory approval, and obligated Shilpa to "obtain and maintain all regulatory approvals for its facilities and operations."[10]

---

[6] Agreement at 1 ("Recitals").
[7] Agreement ¶3.
[8] Agreement ¶¶5.2, 5.6 (emphasis added).
[9] Agreement ¶5.6 (emphasis added).
[10] Agreement ¶5.8.

58. Unicycive and Shilpa signed an amendment to the Agreement (the "First Amendment") on June 25, 2024, which did not alter the terms in the Agreement in the previous paragraphs. In fact, it granted Unicycive additional rights to audit and inspect Shilpa facilities.[11]

59. Because Unicycive engaged Shilpa to perform critical manufacturing and CMC functions in support of the NDA and potential commercial supply of OLC, the FDA's assessment of Shilpa's manufacturing compliance was directly relevant to the likelihood and timing of FDA approval. The FDA's inspection and enforcement tools—described below—are the primary mechanisms through which the Agency evaluates whether manufacturing facilities satisfy these regulatory requirements.

**Regulatory Enforcement of cGMP Requirements**

60. FDA's current good manufacturing practice ("cGMP") regulations require that drug manufacturers maintain an effective quality system through a designated quality unit. The quality control unit is responsible for approving or rejecting drug products—including those "manufactured, processed, packed, or held under contract by another company"—and for approving or rejecting procedures and specifications that impact the identity, strength, quality, and purity of the drug product.[12]

61. cGMP further requires that firms thoroughly investigate "any unexplained discrepancy or failure of a batch or any of its components to meet any of its specifications,"

[11] First Amendment ¶3(c). The First Amendment is available at sec.gov/Archives/edgar/data/1766140/000121390024068565/ea021067201ex10-2_unicycive.htm.

[12] https://www.ecfr.gov/current/title-21/chapter-I/subchapter-C/part-211/subpart-B/section-211.22.

whether or not the batch has already been distributed, and that such investigations extend as appropriate to other batches and potentially associated products.[13]

62. cGMP likewise requires firms to maintain complaint files and investigate complaints in accordance with established procedures, including documenting the investigation and conclusions.[14]

63. For sterile drugs, cGMP requires the establishment and following of appropriate written procedures designed to prevent microbiological contamination of drug products purporting to be sterile, including validation of all aseptic and sterilization processes.[15]

64. cGMP also requires equipment and utensils to be cleaned and maintained at appropriate intervals to prevent contamination that could alter drug safety or quality.[16]

65. FDA has issued guidance explaining that modern quality systems and the cGMP regulations both emphasize corrective action and prevention of recurrence. FDA's "Quality Systems Approach to Pharmaceutical CGMP Regulations" states that corrective action is a reactive tool for system improvement "to ensure that significant problems do not recur," and describes a comprehensive quality systems model consistent with cGMP that is intended to support robust, modern quality systems.[17]

66. FDA has also issued specific guidance addressing contract manufacturing arrangements and quality agreements. FDA's guidance, "Contract Manufacturing Arrangements for Drugs: Quality Agreements," describes FDA's current thinking on how parties in contract

---

[13] https://www.ecfr.gov/current/title-21/chapter-I/subchapter-C/part-211/subpart-J/section-211.192.
[14] https://www.ecfr.gov/current/title-21/chapter-I/subchapter-C/part-211/subpart-J/section-211.198.
[15] https://www.ecfr.gov/current/title-21/chapter-I/subchapter-C/part-211/subpart-F.
[16] https://www.ecfr.gov/current/title-21/chapter-I/subchapter-C/part-211/subpart-D.
[17] https://www.fda.gov/media/71023/download.

manufacturing operations can define and document responsibilities and communications through quality agreements "to ensure compliance with CGMP."[18]

67. Consistent with FDA's quality systems approach and contract manufacturing guidance, the International Council for Harmonisation ("ICH")—whose quality guidelines are adopted by FDA as guidance for industry—describes a pharmaceutical quality system ("PQS") model and the use of quality risk management ("QRM") across the product lifecycle. FDA publishes ICH Q10 ("Pharmaceutical Quality System") as a Guidance for Industry describing a comprehensive model for an effective PQS. https://www.fda.gov/media/71553/download

68. FDA also publishes ICH Q9(R1) ("Quality Risk Management") as a Guidance for Industry. ICH Q9(R1) expressly addresses risks to product availability and supply arising from manufacturing quality issues and emphasizes risk-based decision making.[19]

69. FDA's own materials describing ICH Q9(R1) explain that effective pharmaceutical quality systems use quality risk management to provide an "early warning system" that supports oversight and response to evolving quality/manufacturing risks "from the pharmaceutical company or its external partners."[20]

70. FDA's Office of Inspections and Investigations ("OII") is the lead office for all field activities, including PAIs (described above, ¶¶49-50). During an inspection, if OII investigators observe conditions they deem objectionable, they will issue a Form 483.

71. Specifically, an FDA Form 483 is issued to a company's senior management at the conclusion of an inspection when an investigator(s) has observed any conditions that in their judgment may constitute violations of the Food Drug and Cosmetic (FD&C) Act and related

[18] https://www.fda.gov/media/86193/download.
[19] https://www.fda.gov/media/167721/download.
[20] https://www.fda.gov/media/177720/download, at 10.

Acts.[21] FDA investigators are trained to ensure that each observation noted on the FDA Form 483 is clear, specific and ***significant***.[22] The FDA makes clear that a Form 483 is not used for "observations of questionable or unknown significance."[23] Observations are made when in the investigator's judgment, conditions or practices observed would indicate that any food, drug, device or cosmetic has been adulterated or is being prepared, packed, or held under conditions whereby it may become adulterated or rendered injurious to health.

72. The Form 483 is presented to, and discussed with, the company's senior management at the conclusion of an inspection.[24] The procedure is designed to ensure that firm management has "a full understanding of what the observations are and what they mean."[25] Companies are encouraged to respond in writing with their corrective action plan and then implement that corrective action plan expeditiously.[26] The FDA considers the Form 483 along with a written report called an Establishment Inspection Report, all evidence or documentation collected on-site, and any company responses.[27]

73. The FDA's website clarifies that the Form 483 is ***not*** intended to be "an all-inclusive list of every possible deviation from law and regulation." Instead, "There may be other objectionable conditions that exist at the firm that are not cited on the FDA Form 483.…***Companies are responsible to take corrective action to address the cited objectionable conditions and any related non-cited objectionable conditions that might exist***."

---

[21] https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/inspection-references/fda-form-483-frequently-asked-questions.
[22] *Id.*
[23] *Id.*
[24] *Id.*
[25] *Id.*
[26] *Id.*
[27] *Id.*

74. If the issues cited in a Form 483 are not adequately addressed or are particularly significant, the FDA will notify the company via a warning letter. Among other issues, significant violations can include poor manufacturing practices. The warning letter provides an opportunity for the recipient to address the FDA's concerns and requests a response with a certain timeframe.[28]

75. Separately, the FDA's import enforcement framework includes Import Alerts, which the FDA describes as tools used to protect consumers against products with a history of known violations. According to the FDA, after discovering a violation, it can place products or companies on an Import Alert and thereafter detain future shipments "without having to test or otherwise physically examine" them—known as "Detention Without Physical Examination" ("DWPE").[29]

76. FDA's Import Alert 66-40 specifically concerns "Detention Without Physical Examination of Drugs From Firms Which Have Not Met Drug GMPs," and instructs that FDA divisions may detain without physical examination drugs from foreign establishments listed on the Red List.[30]

77. The FDA has further explained that removal from DWPE under an Import Alert requires evidence that the conditions that led to DWPE have been resolved and that future shipments will be safe and compliant.[31]

78. Accordingly, where a foreign drug manufacturer has a documented enforcement trajectory involving: (i) inspectional observations requiring corrective action, (ii) subsequent "significant violations" articulated in a warning letter, and (iii) eventual placement on an Import

[28] https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/about-warning-and-close-out-letters.
[29] https://www.fda.gov/industry/actions-enforcement/import-alerts.
[30] https://www.accessdata.fda.gov/cms_ia/importalert_189.html.
[31] https://www.fda.gov/industry/import-alerts/removal-dwpe-under-import-alert.

Alert that subjects the firm to DWPE for failure to meet drug GMPs, that progression reflects not an isolated event but an elevated and continuing regulatory concern about the manufacturer's state of control and the effectiveness of its quality system.[32]

79. Under FDA's quality systems approach, contract manufacturing quality agreement guidance, and ICH Q9(R1)/Q10 as adopted by FDA, a sponsor relying on such a facility for drug manufacturing steps would be expected to apply heightened, risk-based oversight to its external partner(s), including clear allocation of quality responsibilities, robust communications and escalation pathways, and risk management tools that function as an "early warning system" for evolving manufacturing quality risks from external partners.

80. Significantly, the overall compliance status of the facility and its history with the FDA can influence the impact of an FDA 483 on the NDA. A facility with a strong compliance record may face fewer hurdles compared to one with a history of significant violations.

**<u>Defendants Hide Shilpa's Persistent cGMP Violations</u>**

81. Shilpa has a well-documented history of systemic, repeated, and unremediated failures to comply with cGMP requirements that began no later than November 2017 and persisted throughout the Class Period. Nevertheless, throughout the Class Period, Defendants touted the regulatory progress for OLC, emphasized manufacturing readiness, and described attendant risks as purely hypothetical.

82. In November 2017, following an on-site inspection of Shilpa's Unit IV facility in Jadcherla, India (FDA Establishment Identifier ("FEI") 3009876430), FDA investigators issued a Form FDA 483 identifying ten inspectional observations, i.e., "clear, specific, and significant violations," including failures to adequately investigate out-of-specification ("OOS") results,

[32] https://www.fda.gov/media/71023/download.

improper invalidation of failing laboratory results, inadequate complaint investigations, deficient aseptic processing controls, weak cleaning validation practices, and inadequate laboratory and stability testing controls. These observations went to the core of Shilpa's quality system and reflected systemic, rather than isolated, cGMP failures.

83. Despite its receipt of the Form 483, describing clear, specific, and significant FD&C infractions, Shilpa failed to take sufficient heed. Shilpa's serious cGMP deficiencies therefore persisted.

84. Indeed, on October 9, 2020—three weeks before Unicycive entered into the Agreement with Shilpa—the FDA issued a Warning Letter[33] to Shilpa following its inspection of the same Shilpa drug manufacturing facility targeted in the November 2017 Form 483 (FEI 3009876430) ("Warning Letter") formally citing Shilpa for significant violations of cGMP,

85. Specifically, the Warning Letter stated:

> This warning letter summarizes ***significant violations of current good manufacturing practice (CGMP) regulations for finished pharmaceuticals***. See Title 21 Code of Federal Regulations (CFR), parts 210 and 211 (21 CFR parts 210 and 211).
>
> Because your methods, facilities, or controls for manufacturing, processing, packing, or holding do not conform to CGMP, your drug products are adulterated within the meaning of section 501(a)(2)(B) of the Federal Food, Drug, and Cosmetic Act (FD&C Act), 21 U.S.C. 351(a)(2)(B).

Emphasis added. Notably, the FDA issued the Warning Letter after first issuing a Form 483 detailing the deficiencies found during the inspection. The FDA reviewed Shilpa's responses to the Form 483 "in detail" and found each of its responses "inadequate." The Warning Letter followed, citing numerous significant violations of cGMP regulations, including a failure to adequately investigate OOS results and failure to properly investigate and classify complaints

[33] https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/shilpa-medicare-limited-607877-10092020.

involving particulate contamination and sterility risk. Critically, the FDA expressly stated that inadequate OOS investigations constituted a "repeat CGMP violation from the 2017 FDA inspection."

86. The conclusion to the Warning Letter made clear that "[t]he violations cited in this letter are not intended to be an all-inclusive list of violations that exist at your facility." Significantly, the Warning Letter admonished that:

> Until you correct all violations completely and we confirm your compliance with CGMP, FDA may withhold approval of any new drug applications or supplements listing your firm as a drug manufacturer.

87. Even after receiving the Warning Letter in 2020, Shilpa failed to adequately address or remediate the significant violations that led to its issuance. As a result, in February 2021, the FDA issued an Import Alert, banning the import into the U.S. of all but three drugs that Shilpa manufactures.[34]

88. Specifically, the FDA's publicly maintained Red List for Import Alert 66-40 identifies Shilpa Medicare Limited, located at Plot Nos. S-20 to S-26, Green Industrial Park, Jadcherla, Telangana, India, as a firm subject to DWPE.[35] The Red List reflects that the FDA originally placed Shilpa on the Red List on February 16, 2021, following an FDA inspection and enforcement activity.[36]

89. FDA's Red List further reflects that Shilpa Medicare Limited remains listed under Import Alert 66-40, with the most recent published date of December 23, 2025, confirming that FDA has recently reaffirmed or updated that the DWPE still applies to Shilpa currently.[37]

---

[34] https://www.accessdata.fda.gov/cms_ia/importalert_189.html.
[35] *Id.*
[36] *Id.*
[37] *Id.*

90. The Red List entries for Shilpa Medicare Limited apply broadly to "All Drug and Drug Products" across numerous FDA product classifications, including human prescription drugs, non-prescription drugs, combination products, investigational drugs, antibiotics, pharmaceutical necessities, and therapeutic biologic and biosimilar drugs, with a limited exclusion for Azacitidine Injection.[38]

91. FDA guidance explains that removal from Import Alert 66-40 requires affirmative evidence that the firm has corrected the underlying cGMP violations and can reliably manufacture drugs in compliance with applicable requirements. Absent such a determination, continued listing on the Red List reflects FDA's conclusion that sustained cGMP compliance has not been demonstrated.[39]

92. The continued listing of Shilpa Medicare Limited on Import Alert 66-40—originally imposed in 2021 and reaffirmed as of December 23, 2025—demonstrates ongoing and unresolved FDA regulatory concern regarding the firm's state of control and effectiveness of its quality system.

93. Moreover, it is irrelevant under the FDA's regulatory framework that the Import Alert does not reference OLC specifically. Import Alert 66-40 applies to drug manufacturers that are not operating in compliance with cGMP, and authorizes DWPE of "all drug and drug products" manufactured at the listed establishment, subject only to expressly stated exclusions. FDA regulations make clear that such enforcement actions are facility-based, not product-specific, and that the FDA may withhold or delay approval of an NDA if it lists a facility that has not demonstrated sustained cGMP compliance, regardless of whether the cited deficiencies relate to a particular product. 21 C.F.R. § 314.125(b)(13) (the FDA may refuse to approve an NDA

---

[38] *Id.*
[39] *Id.*

where "The methods to be used in, and the facilities and controls used for, the manufacture, processing, packing, or holding of the drug substance or the drug product do not comply with the current good manufacturing practice regulations in parts 210 and 211.") Accordingly, the existence of an active Import Alert at a facility involved in manufacturing activities relevant to OLC constituted a material regulatory risk to OLC's approval timeline and required heightened oversight and disclosure, irrespective of whether Shilpa's cGMP deficiencies directly pertained to OLC.

94. At no point during the Class Period did Defendants disclose that Shilpa, which they relied upon for OLC manufacturing activities or Shilpa-controlled subcontracted activities, had a longstanding, unresolved, and escalating FDA enforcement history demonstrating systemic cGMP failures—including an active Import Alert that subjects Shilpa's products to DWPE.

95. The progression from a multi-observation Form 483 in 2017, to a Warning Letter citing repeat violations in 2020 (the same month that Unicycive and Shilpa executed the Agreement), to an ongoing Import Alert 66-40 imposed in 2021 and still active today, constituted unambiguous regulatory red flags that raised a substantial risk of further cGMP deficiencies. Shilpa's checkered regulatory history obligated Unicycive to employ heightened, risk-based oversight, including more frequent audits, deeper access to investigation and CAPA (corrective and preventive actions) data, scrutiny of subcontractors, and escalation mechanisms sufficient to detect problems before FDA intervention.

96. The sole regulatory action against Shilpa that Defendants disclosed appears in the 2024 10-K, wherein Defendants included a single statement in the eighty two page filing stating that, "[i]n March 2025, FDA conducted a general surveillance inspection of Shilpa Medicare Ltd, where the Company received one "procedural observation" in form 483." Defendants did not identify the observation, did not explain what a form 483 is, did not ascribe any significance to

its issuance, nor did they reveal the relevant history of other regulatory actions Shilpa had faced which put the OLC NDA at risk. However, Plaintiff obtained an unredacted copy of the March 2025 Form 483 via a FOIA request which explained that the infraction—which occurred at different facility than the one referenced in the 2017 Form 483, the Warning Letter, and the Import Alert—involved "over one hundred Lab Incidents" due to "human errors since Jan 2022 despite ongoing retraining and re-qualification of analysts within the lab."

97. Post Class Period, Shilpa received another Form 483 in November 2025, following an on-site inspection of the *same* Shilpa facility referenced in the November 2017 Form 483, the Warning Letter, and the Import Alert (FEI 3009876430), identifying eight observations, many of which reflect that cGMP deficiencies previously identified in 2017 and 2020 persisted, including failures to adequately control aseptic processing and prevent microbiological contamination, deficiencies in sterilization validation and environmental monitoring, inadequate cleaning and maintenance of equipment and facilities, and continued weaknesses in laboratory controls, documentation, and quality system oversight.

**<u>Defendants Knew or Should Have Known About the Substantial Risk to the OLC NDA</u>**

98. Plaintiffs retained pharmaceutical expert Todd Clark to assess what Defendants should have known regarding the substantial risk to the OLC NDA caused by Shilpa's unresolved cGMP compliance failures. Mr. Clark has a Master of Science degree in drug development and regulation from Johns Hopkins University and an MBA from the Kellogg School of Business at Northwestern University. He is a pharmaceutical expert with more than thirty years of experience consulting for branded and generic drug companies, as well as biotech firms, investment banks, and health technology services to advise them on, among other things, drug development, clinical trial design, and regulatory compliance including cGMP issues. Mr. Clark has consulted with many of the top pharmaceutical companies in the world, has published extensively on industry topics,

and has been frequently quoted in trade journals and by academics, and he has testified in numerous cases as an expert on pharmaceutical matters.

99. As part of his evaluation Mr. Clark reviewed the Agreement; the First Amendment; Unicycive's 2024 10-K; Unicycive's press releases dated June 10, 2025, June 30, 2025, and December 29, 2025; the Warning Letter; FDA Import Alerts Database; FDA Compliance Program 7346.832 (September 26, 2019); and FDA Guidance: Contract Manufacturing Arrangements for Drugs: Quality Agreements (November 2016).

100. Based on that review, Mr. Clark concluded that the cGMP problems may have been identified had Unicycive availed itself of its contractual rights to audit Shilpa and any third-party performing critical manufacturing steps for OLC to ensure compliance.

101. According to Mr. Clark, FDA Compliance Program 7346.832 ("New Drug Evaluation") provides that inspections resulting in an Official Action Indicated ("OAI") classification will lead to a "Withhold" approval recommendation for an NDA, thereby ensuring that "the product cannot be marketed in the United States until a follow-up inspection verifies implementation of appropriate corrective actions or until corrections are substantially verified through other appropriate means."[40]

102. Mr. Clark concluded that any reasonable pharmaceutical company in Unicycive's position, relying on a particular manufacturer for its NDA, would have invoked the provisions of its supply agreement to increase audit frequency and scope, verify CAPA effectiveness, and scrutinize subcontractors performing critical manufacturing steps. Exercising active oversight is particularly important given Shilpa's history of cGMP compliance problems and longstanding presence on the Import Alert list.

[40] Food and Drug Administration Compliance Program, Program 7346.832, Chapter 46—New Drug Evaluation (Sep 16, 2019), page 4.

103. As explained above, section 5.6 of the October 31, 2020 Agreement granted Unicycive the right "to audit and inspect any manufacturing, testing or quality control facilities used by Shilpa or by Third Party Manufacturers for the Renazorb provided to UNICYCIVE and/or UNICYCIVE Designees hereunder, including but not limited to all compliance and other filings to applicable Regulatory Authorities as required under the Legal Requirements." Section 5.6 also required Shilpa to "immediately notify UNICYCIVE of any inspections performed by any Regulatory Authority at any of the aforementioned facilities and the results of such inspections." Further, under Section 5.7(a) these obligations also extended to activities by any third-party manufacturers Shilpa chose to engage.

104. According to Mr. Clark, these provisions are consistent with the November 2016 FDA guidance document, "Contract Manufacturing Arrangements for Drugs: Quality Agreements," which underscores the oversight responsibility of a drug company regarding its chosen manufacturer. While the guidance document technically applies to post-approval drugs, the FDA states therein that, "Many of the principles described in this guidance could be applied in pre-commercial stages of the pharmaceutical life cycle." For example, the guidance document provides, *inter alia*, that:

- …the owner remains responsible for ensuring its products are made in compliance with CGMP even when a quality agreement assigns a particular manufacturing activity to the contract facility.
- … The written agreements should also define considerations for subcontracting; describe how changes to processes, equipment, methods, and specifications will be managed; and permit the owner to audit its contractor's facilities for compliance with CGMP.

- [The NDA holder is responsible for] assessing the suitability and competence of potential contractors before outsourcing operations or selecting material suppliers. This could be accomplished through audits, material evaluations, or other qualification criteria.
- The quality agreement should explain how the contractor will report manufacturing deviations to the owner, as well as how deviations will be investigated, documented, and resolved in compliance with CGMP.
- … The agreement should allow owners to evaluate and audit contract facilities to ensure CGMP compliance for specific operations. This provision should cover both routine quality audits and for-cause audits. The agreement should also set owner and contract facility expectations regarding FDA inspections (pre-approval, routine surveillance, and for-cause) with consideration for the nature of the products to be manufactured and/or services to be provided. It should include the parties' agreed-upon provisions for communicating inspection observations and findings, as well as relevant FDA actions and correspondence.
- …the quality agreement should address when, how, and what information the contractor will report to owners about objectionable conditions observed during inspections and audits of the contract facility.

105. Specifically, under FDA guidance, a sponsor relying on a manufacturer with Shilpa's enforcement history would be expected to implement—among other measures—heightened, risk-based quality oversight including increased audit frequency and scope, verification of CAPA effectiveness for repeat findings, and scrutiny of subcontractors performing critical manufacturing steps. That is because the sponsor of an NDA is ultimately responsible for

ensuring that its drug is manufactured in compliance with cGMP. Indeed, 21 CFR 211.22 sets forth the responsibilities of the sponsor's quality control unit and provides:

> (a) There shall be a quality control unit that shall have the responsibility and authority to approve or reject all components, drug product containers, closures, in-process materials, packaging material, labeling, and drug products, and the authority to review production records to assure that no errors have occurred or, if errors have occurred, that they have been fully investigated. **The quality control unit shall be responsible for approving or rejecting drug products manufactured, processed, packed, or held under contract by another company.** (Emphasis added.)

**<u>Materially False and Misleading Statements Issued During the Class Period</u>**

106. The Class Period begins on March 29, 2024. On March 28, 2024, during after-market hours, Unicycive filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for its FY ended December 31, 2023 (the "2023 10-K"). The 2023 10-K was signed by Defendants Gupta and Townsend. In a section titled "Oxylanthanum Carbonate [OLC]," the 2023 10-K stated, in relevant part:

> With regards to manufacturing, testing and potential commercial supply of [OLC], we have entered into an agreement with Shilpa Medicare Ltd based in India. According to the terms of the agreement, ***following [OLC] approval by the FDA, Unicycive will pay the vendor $2 million in the first calendar year when the net revenue reaches $10 million from sales of [OLC] and commercial supply of the product by the vendor (First Payment).*** Thereafter, we will pay $2 million per year for four consecutive years, after the first year's payment, for the total payments of $10 million, provided all commercial supplies are continued to be manufactured and supplied by the vendor. ***Unicycive is not obligated to make any payments to the vendor until FDA approval of the product is obtained and commercial revenue is generated.***

(Emphasis added.)

107. The foregoing statements misled investors because, having raised the topic of Shilpa's manufacture of OLC after FDA approval and its expected approval, Defendants triggered

a duty to disclose that: (i) beginning no later than 2017, Shilpa exhibited systemic and repeated failures to comply with FDA cGMP requirements resulting in the FDA's issuance of a Form 483 in 2017, a Warning Letter in 2020 noting a repeat violation, and an Import Alert in 2021 that remains in effect today and subjects most of Shilpa's manufactured drug products to DWPE, prohibiting their entry into the United States; and (ii) that the FDA would not approve the OLC NDA absent resolution of its manufacturer's cGMP deficiencies.

108. The 2023 10-K also stated, in relevant part:

> ***Risks related to our Business.***
>
> * * *
>
> We have no experience manufacturing product candidates on a clinical or commercial scale and will be dependent on third parties for the manufacture of our product candidates. ***If we experience problems with any of these third parties, they could delay clinical development or marketing approval of our product candidates or our ability to sell any approved products.***

(Emphasis added.)

109. The foregoing statement misled investors because it warned generically that Unicycive could hypothetically experience future problems with the manufacture of OLC that could hypothetically impact FDA approval of OLC, without disclosing that these problems had already materialized because: (i) beginning no later than 2017, Unicycive's manufacturer for OLC, Shilpa, exhibited systemic and repeated failures to comply with FDA cGMP requirements resulting in the FDA's issuance of a Form 483 in 2017, a Warning Letter in 2020 noting a repeat violation, and an Import Alert in 2021 that remains in effect today and subjects most of Shilpa's manufactured drug products to DWPE, prohibiting their entry into the United States; and (ii) the FDA would not approve the OLC NDA absent resolution of its manufacturer's cGMP deficiencies.

110. The 2023 10-K also stated, in relevant part:

> ***If we are not able to obtain, or if there are delays in obtaining, required regulatory approvals, we will not be able to commercialize, or will be delayed in commercializing, our product candidates and our ability to generate revenue will be impaired.***
>
> Our product candidates and the activities associated with its development and commercialization, including its design, testing, manufacture, release, safety, efficacy, regulatory filings, recordkeeping, labeling, storage, approval, advertising, promotion, sale and distribution, is subject to comprehensive regulation by the FDA and other regulatory authorities in the United States and by comparable authorities in other countries.
>
> * * *
>
> The FDA and comparable authorities in other countries have substantial discretion in the approval process and may refuse to accept any application or may decide that our data are insufficient for approval and require additional pre-clinical or other studies, changes in the manufacturing process or facilities or clinical trials. Moreover, approval by the FDA or an equivalent foreign authority, including the HSA, does not ensure approval by regulatory authorities in any other countries or jurisdictions, but a failure to obtain marketing approval in one jurisdiction may adversely impact the likelihood of approval in other jurisdictions. In addition, ***varying interpretations of the data obtained from*** pre-clinical testing, ***manufacturing*** and product testing and clinical trials ***could delay, limit or prevent marketing approval of a product candidate***. Additionally, any marketing approval we ultimately obtain may be limited or subject to restrictions or post-approval commitments that render the approved product not commercially viable.

(Emphasis added.)

111. The foregoing statements misled investors because Defendants warned generically that the FDA could hypothetically decline to approve the OLC NDA, without disclosing that a substantial risk of delay or rejection had already materialized because: (i) Unicycive's manufacturer for OLC, Shilpa, has exhibited systemic and repeated failures to comply with FDA cGMP requirements resulting in the FDA's issuance of a Form 483 in 2017, a Warning Letter in 2020 noting a repeat violation, and an Import Alert in 2021 that remains in effect today that subjects most of Shilpa's manufactured drug products to DWPE, prohibiting their entry into the United States; and (ii) the FDA would not approve the OLC NDA absent resolution of its manufacturer's cGMP deficiencies.

112. The 2023 10-K also stated, in relevant part:

> ***Our reliance on third parties heightens the risks faced by our business.***
>
> We rely on suppliers, vendors and partners for certain key aspects of our business, including support for information technology systems and certain human resource functions. We do not control these partners, but we depend on them in ways that may be significant to us. If these parties fail to meet our expectations or fulfill their obligations to us, we may fail to receive the expected benefits. In addition, ***if any of these third parties fails to comply with applicable laws and regulations in the course of its performance of services for us, there is a risk that we may be held responsible for such violations as well.*** This risk is particularly serious in emerging markets, where corruption is often prevalent and where many of the third parties on which we rely do not have internal compliance resources comparable to our own. Any such failures by third parties, in emerging markets or elsewhere, could adversely affect our business, reputation, financial condition or results of operations.

(Emphasis added.)

113. The foregoing statement in the 2023 10-K misled investors for the reasons stated in ¶109.

114. The 2023 10-K also stated, in relevant part:

> [L]ater discovery of ***previously unknown problems with our*** products, ***manufacturers or manufacturing processes and facilities or failure to comply with regulatory requirements***, may result in, among other things:
>
> - ***restrictions on such products, manufacturers or manufacturing processes or facilities;***
> - ***restrictions on the labeling, marketing, distribution or use of a product;***
> - requirements to conduct post-approval clinical trials, other studies or other post-approval commitments;
> - ***warning or untitled letters;***
> - withdrawal or recall of the products from the market;
> - ***refusal to approve pending applications or supplements to approved applications that we submit;***
> - fines, restitution or disgorgement of profits or revenue;
> - suspension or withdrawal of marketing approvals;
> - refusal to permit the import or export of our products;
> - product seizure; and
> - injunctions or the imposition of civil or criminal penalties.

(Emphasis added.)

115. The foregoing statement misled investors for the reasons stated in ¶109. Furthermore, by characterizing the hypothetical problems as "previously unknown problems," the foregoing statement misled investors by creating the misleading impression that there are no such problems that were previously known.

116. The 2023 10-K also stated, in relevant part:

> We have no experience manufacturing product candidates on a clinical or commercial scale and will be dependent on third parties for the manufacture of our product candidates. ***If we experience problems with any of these third parties, they could delay clinical development or marketing approval of our product candidates or our ability to sell any approved products.***
>
> We do not have any manufacturing facilities. We expect to rely on third-party manufacturers for the manufacture of our product candidates for clinical trials and for commercial supply of any product candidate for which we obtain marketing approval.
>
> * * *
>
> ***Third-party manufacturers may not be able to comply with U.S. cGMPs or similar regulatory requirements outside the United States. Our failure, or the failure of our third-party manufacturers, to comply with cGMPs or other applicable regulations, even if such failures do not relate specifically to our product candidates or approved products, could result in sanctions being imposed on us or the manufacturers, including fines, injunctions, civil penalties, delays, suspension or withdrawal of approvals, license revocation, seizures or recalls of product candidates, operating restrictions and criminal prosecutions, any of which could adversely affect supplies of our product candidates and harm our business and results of operations.***
>
> * * *
>
> Furthermore, we expect to rely on third parties to release, label, store and distribute drug supplies for our clinical trials. ***Any performance failure on the part of these third parties, including a failure that may not relate specifically to our product candidates, could delay or otherwise adversely impact clinical development or marketing approval of our product candidates or commercialization of our drug, producing losses and depriving us of potential revenue.***

(Emphasis added.)

117. The foregoing statement in the 2023 10-K misled investors for the reasons stated in ¶109.

118. The 2023 10-K also stated, in relevant part:

> ***Our employees may engage in misconduct or other improper activities, including noncompliance with regulatory standards and requirements, which could cause significant liability for us and harm our reputation.***
>
> We are exposed to the risk of employee fraud or other misconduct, including intentional failures to comply with FDA regulations or similar regulations of comparable foreign regulatory authorities, provide accurate information to the FDA or comparable foreign regulatory authorities, ***comply with manufacturing standards we have established***, comply with federal and state healthcare fraud and abuse laws and regulations and similar laws and regulations established and enforced by comparable foreign regulatory authorities, report financial information or data accurately or disclose unauthorized activities to us.

(Emphasis added.)

119. The foregoing statement misled investors because it generically warned of a hypothetical risk that a failure to comply with manufacturing standards could materially impact the Company, without disclosing that failures to comply with manufacturing standards had already materialized because: (i) Unicycive's manufacturer for OLC, Shilpa, has exhibited systemic and repeated failures to comply with FDA cGMP requirements resulting in the FDA's issuance of a Form 483 in 2017, a Warning Letter in 2020 noting a repeat violation, and an Import Alert in 2021 that remains in effect today that subjects most of Shilpa's manufactured drug products to DWPE, prohibiting their entry into the United States; and (ii) the FDA would not approve the OLC NDA absent resolution of its manufacturer's cGMP deficiencies.

120. The 2023 10-K stated that "[w]e plan to continue to use third-party service providers, including contract manufacturing organizations, . . . to manufacture and supply the materials to be used during the development and commercialization of our product candidates."

121. The foregoing statement misled investors because it created the misimpression that the current CMO, Shilpa, was capable of manufacturing and supplying the materials to be used during the development and commercialization of OLC, when, in fact, absent remediation of Shilpa's ongoing cGMP deficiencies and removal from Import Alert 66-40, Shilpa faced a substantial risk of being unable to manufacture and supply an FDA-approved commercial product.

122. Appended as exhibits to the 2023 10-K were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein Defendants Gupta and Townsend certified, in relevant part, that the 2023 10-K "***does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]***"

123. The foregoing statement misled investors because of the inclusion of false statements in the 2023 10-K, as described in ¶¶106-21.

124. The same day, also during after-market hours, Unicycive issued a press release announcing its full-year ("FY") 2023 financial results and business updates. The next day, March 29, 2024, Unicycive filed a current report on Form 8-K with the SEC, signed by Defendant Gupta, which included the press release as Exhibit 99.1. The press release incorporated the false or misleading statements contained in the 2023 10-K by stating, in a section on "Forward Looking Statements:"

> ***There are several factors that could cause actual events to differ materially from those indicated by such forward-looking statements.*** These factors include, but are not limited to, clinical trials involve a lengthy and expensive process with an uncertain outcome, and results of earlier studies and trials may not be predictive of future trial results; our clinical trials may be suspended or discontinued due to unexpected side effects or other safety risks that could preclude approval of our product candidates; risks related to business interruptions which could seriously

> harm our financial condition and increase our costs and expenses; dependence on key personnel; substantial competition; uncertainties of patent protection and litigation; dependence upon third parties; and ***risks related to failure to obtain FDA clearances or approvals and noncompliance with FDA regulations***. Actual results may differ materially from those indicated by such forward-looking statements as a result of various important factors, including: the uncertainties related to market conditions and ***other factors described more fully in the section entitled 'Risk Factors' in Unicycive's Annual Report on Form 10-K for the year ended December 31, 2023,*** and other periodic reports filed with the Securities and Exchange Commission.

(Emphasis added.)

125. The foregoing statement misled investors because it incorporated the misleading warnings of hypothetical future risk from the 2023 10-K, as described in ¶¶108-21.

126. On May 13, 2024, Unicycive filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for its first quarter ended March 31, 2024 (the "1Q24 10-Q"). The 1Q24 10-Q was signed by Defendants Gupta and Townsend. The 1Q24 10-Q stated, in relevant part:

> **3. Significant Agreements**
>
> With regards to manufacturing, testing and potential commercial supply of Oxylanthanum Carbonate, the Company has entered into an agreement with Shilpa Medicare Ltd based in India. According to the terms of the agreement ***Unicycive will pay the vendor*** $2 million in the first calendar year when the net revenue reaches $10 million from sales of Oxylanthanum Carbonate ***following its approval by the FDA and commercial supply of the product by the vendor***. Thereafter, the Company will pay $2 million per year for four consecutive years, after the first year's payment, for total payments of $10 million, provided all commercial supplies are continued to be manufactured and supplied by the vendor. ***Unicycive is not obligated to make any payments to the vendor until FDA approval of the product is obtained and commercial revenue is generated.***

(Emphasis added.)

127. The foregoing statement misled investors for the reasons stated in ¶107.

128. The 1Q24 10-Q also stated, in its section on "Forward Looking Statements:"

> *The following discussion and analysis of our financial condition and results of operations should be read in conjunction with our financial statements and the*

> *related notes to those statements included elsewhere in this quarterly report and in our previously filed Form 10-K.*

129. The foregoing statement misled investors because it incorporated the false and misleading statements from the 2023 10-K, as described in ¶¶106-121.

130. Appended as exhibits to the 1Q24 10-Q were signed SOX certifications wherein Defendants Gupta and Townsend certified, in relevant part, that the 1Q24 10-Q "***does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]***"

131. The foregoing statement misled investors because it incorporated the false and misleading statements in the 2023 10-K, as described in ¶¶106-21.

132. On May 13, 2024, Unicycive filed a current report on Form 8-K, announcing its first quarter 2024 financial results and business updates (the "1Q24 8-K"). The 1Q24 8-K was signed by Defendant Gupta. Attached as Exhibit 99.1 was a press release that incorporated the false or misleading statements contained in the 2024 10-K by stating, in relevant part:

> ***There are several factors that could cause actual events to differ materially from those indicated by such forward-looking statements.*** These factors include, but are not limited to, clinical trials involve a lengthy and expensive process with an uncertain outcome, and results of earlier studies and trials may not be predictive of future trial results; our clinical trials may be suspended or discontinued due to unexpected side effects or other safety risks that could preclude approval of our product candidates; risks related to business interruptions which could seriously harm our financial condition and increase our costs and expenses; dependence on key personnel; substantial competition; uncertainties of patent protection and litigation; dependence upon third parties; and ***risks related to failure to obtain FDA clearances or approvals and noncompliance with FDA regulations***. Actual results may differ materially from those indicated by such forward-looking statements as a result of various important factors, including: the uncertainties related to market conditions and other factors ***described more fully in the section entitled 'Risk Factors' in Unicycive's Annual Report on Form 10-K for the year ended December 31, 2023,*** and other periodic reports filed with the Securities and Exchange Commission.

(Emphasis added.)

133. The foregoing statement misled investors because it incorporated the misleading warnings of hypothetical future risk from the 2023 10-K, as described in ¶¶106-21.

134. On May 18, 2024, Defendant Gupta presented on behalf of Unicycive at a session of the Noble Capital Markets Emerging Growth Virtual Healthcare Equity Conference hosted by Noble Capital Senior Biotechnology Analyst Robert LeBoyer. In his opening remarks, Defendant Gupta said, in relevant part:

> Our lead drug is for treatment of hyperphosphatemia in patients who are suffering from chronic kidney disease. We are currently running a pivotal clinical trial, which we expect to report this quarter, the top line data, and file our NDA right after that. It's a fairly late-stage program. ***It's a significantly de-risked program.***

(Emphasis added.)

135. The foregoing statement misled investors because it described the program to approve OLC's NDA as "de-risked," meaning it had its risk of harm reduced or removed, when, in fact, it faced a substantial risk of delay or rejection because: (i) beginning no later than 2017, Shilpa, the manufacturer engaged for OLC, exhibited systemic and repeated failures to comply with FDA cGMP requirements resulting in the FDA's issuance of a Form 483 in 2017, a Warning Letter in 2020 noting a repeat violation, and an Import Alert in 2021 that remains in effect today and subjects most of Shilpa's manufactured drug products to DWPE, prohibiting their entry into the United States; and (ii) the FDA would not approve the OLC NDA absent resolution of its manufacturer's cGMP deficiencies. These omitted facts rendered Defendants' description of the regulatory pathway as "de-risked" misleading because, under FDA's regulatory framework, unresolved facility-level cGMP deficiencies independently threaten NDA approval regardless of clinical data.

136. In the same session, LeBoyer asked Gupta, “could you just go over some of the milestones to look forward to between now and when the drug reaches the market?” Defendant Gupta responded, in relevant part:

> Number one is the top line data. This gives you clarity. It's an open-label study, but we're still capable of having the top line data. So, that's a very quick, like, as in few weeks. Number two, I'm talking about the key milestone. Number two is getting a NDA filed. That's number two, ***which we can file shortly after top line data.*** Number three is the FDA accepting that NDA, which is when FDA gives you PDUFA date saying this is the date we'll give you an approval or give you a decision on approval.

(Emphasis added.)

137. The foregoing statement misled investors because it created the impression of a quick and typical NDA process, which triggered a duty to disclose a duty to disclose that beginning no later than 2017, Shilpa exhibited systemic and repeated failures to comply with FDA cGMP requirements resulting in the FDA’s issuance of a Form 483 in 2017, a Warning Letter in 2020 noting a repeat violation, and an Import Alert in 2021 that remains in effect today and subjects most of Shilpa’s manufactured drug products to DWPE, prohibiting their entry into the United States. Defendants’ descriptions of a “typical” regulatory timeline were misleading because they omitted known facts showing that Unicycive’s NDA did not present a typical manufacturing risk profile, given Shilpa’s unresolved enforcement history and active Import Alert.

138. On May 30, 2024, Defendant Gupta presented on behalf of Unicycive at a session of the Lytham Partners Spring Investor Conference hosted by Lytham Partners Vice President Roger Weiss. During the session, Weiss asked, “where does the company sit in terms of the regulatory process to get this new drug approved?” Defendant Gupta responded, in relevant part:

> So we are running a clinical trial, which is a – as we have said before, we really expect to finish the trial and report the data in next few days or few weeks. We guide it as Q2. Q2 is the ongoing. ***So it's any day, any time we get the data we***

> ***present set top-line data. And within a few weeks after that, we file our NDA.*** So we remain highly focused on that. We file NDA. And then ***a typical regulatory process*** is that 10 months to 12 months less take on the higher end of the cycle. That is 12 months. ***So that gets the drug approved mid-next year, mid 2025.***

(Emphasis added.)

139. The foregoing statement misled investors for the reasons stated in ¶137. Separately, the foregoing statement misled investors because it described drug approval in mid-2025 as probable, without disclosing that: (i) beginning no later than 2017, Shilpa exhibited systemic and repeated failures to comply with FDA cGMP requirements resulting in the FDA's issuance of a Form 483 in 2017, a Warning Letter in 2020 noting a repeat violation, and an Import Alert in 2021 that remains in effect today and subjects most of Shilpa's manufactured drug products to DWPE, prohibiting their entry into the United States; and (ii) the FDA would not approve the OLC NDA absent resolution of its manufacturer's cGMP deficiencies.

140. On June 25, 2024, Unicycive filed a current report on Form 8-K, announcing positive results from an OLC clinical trial (the "June 2024 Trial Results 8-K"). The June 2024 Trial Results 8-K was signed by Defendant Gupta. Attached as Exhibit 99.1 was a press release that incorporated the false or misleading statements contained in the 2024 10-K by stating, in relevant part:

> ***There are several factors that could cause actual events to differ materially from those indicated by such forward-looking statements.*** These factors include, but are not limited to, clinical trials involve a lengthy and expensive process with an uncertain outcome, and results of earlier studies and trials may not be predictive of future trial results; our clinical trials may be suspended or discontinued due to unexpected side effects or other safety risks that could preclude approval of our product candidates; risks related to business interruptions, which could seriously harm our financial condition and increase our costs and expenses; dependence on key personnel; substantial competition; uncertainties of patent protection and litigation; dependence upon third parties; and ***risks related to failure to obtain FDA clearances or approvals and noncompliance with FDA regulations.*** Topline data from the Oxylanthanum carbonate (OLC) pivotal trial is preliminary and subject to change based on further detailed analysis. Actual results may differ materially from those indicated by such forward-looking statements as a result of various important

> factors, including: the uncertainties related to market conditions and ***other factors described more fully in the section entitled 'Risk Factors' in Unicycive's Annual Report on Form 10-K for the year ended December 31, 2023***, and other periodic reports filed with the Securities and Exchange Commission.

(Emphasis added.)

141. The foregoing statement misled investors because it incorporated the misleading warnings of hypothetical future risk from the 2023 10-K, as described in ¶¶108-21.

142. On the same day, Unicycive held a conference call with analysts to discuss the positive results from the OLC clinical trial disclosed in the June 2024 Trial Results 8-K (the "June 2024 Trial Results Call"). During the question-and-answer section of the call, Benchmark Company analyst Bruce Jackson asked, "[i]n addition to the data that you've got now, is there anything else in the FDA package that needs to be completed?" Defendant Gupta responded, in relevant part:

> Thank you, Bruce. ***As a part of our NDA, we will be providing the*** full preclinical, clinical and ***CMC data package***, so we will be completing that in the next few days. Our aim is to file NDA as soon as possible. However, ***as it relates to any requirement from the FDA, this was the last piece that we needed to complete.*** The rest of it is completing the dossier and supplemental package. ***There is no other pending*** clinical trial or any other ***requirement from the FDA***.
>
> I should just clarify, this was the only trial that the FDA has asked us to conduct so that in terms of any additional studies, none. ***And the remaining time that we need is to just complete and submit the dossier.***

(Emphasis added.)

143. The foregoing statement misled investors by representing that the OLC NDA satisfied every requirement from the FDA when in fact, the OLC NDA relied upon a manufacturer, Shilpa, that exhibited systemic and repeated failures to comply with FDA cGMP requirements, including the FDA's issuance of a Form 483 in 2017, a Warning Letter in 2020 noting a repeat violation, and an Import Alert in 2021 that remains in effect today and subjects most of Shilpa's manufactured drug products to DWPE, prohibiting their entry into the United

States, thus placing the OLC NDA in jeopardy. Furthermore, the foregoing statement misled investors for the reasons stated in ¶137.

144. Later in the question-and-answer section, Analyst LeBoyer asked:

> My question I think was partially answered but I just wanted to confirm some of the things about the NDA. And my understanding is that some of the sections have been completed and that this is the only missing thing so that it will be submitted during the section quarter. Is that correct?

In response, Defendant Gupta stated, in relevant part:

> You mean the third quarter? There, like I – as mentioned earlier, we do not have any other requirement. Our goal is to complete the dossier, submit as soon as possible. Given that we are end of June, so the next week is the third quarter, our goal is to provide the NDA to the FDA ***with all sections completed*** as soon as possible. We are working on it. Our goal is to do it in the days as opposed to weeks. So, we will do it as soon as possible but we are given a target guidelines of next quarter and we haven't given a specific date or time or week. But our goal is to not take any longer than we need to, to be able to provide the NDA submission.
>
> And, yes, ***we have completed many sections of the NDA, which were already completed***. This trial data, we've got just the topline data earlier and we completed the topline analysis. We're reporting the data today. ***It will take us just a few days*** to be able to complete the study ***and submit the dossier.***

145. The foregoing statement misled investors for the reasons stated in ¶137.

146. Later in the question-and-answer section, Brooklyn Capital Markets analyst Kumaraguru Raja asked: "What I wanted to clarify with regard to the review timeline, the expectation is that it will be six months following the acceptance?" Defendant Gupta responded, in relevant part:

> Kumar, the ***typical guidelines*** that FDA has given is between 9 to 12 months. Conservatively, we're looking at the, you can say 10 to 12 months. But we believe it is a 12-month review cycle given how backlogged has been FDA's review process. If there is anything earlier than that, we would be happy to report. But our assumption is that we file next quarter and ***the review gets us approval mid next year.***

(emphasis added).

147. The foregoing statement misled investors for the reasons stated in ¶¶137, 139.

148. Later in the question-and-answer section, Raja asked, "in terms of manufacturing, where do you stand and what are the next steps in terms of buildout of the commercial team?" Defendant Gupta responded, in relevant part:

> [Y]ou have two questions there. Let me answer one-by-one. ***With regard to manufacturing, we are very, very much ready*** and have tested, validated batches at multi hundreds of kilograms level. ***So we are ready,*** we are scaling up our manufacturing process. ***There is no problem. We are ready to launch mid next year. So from manufacturing part, we have been working on these years to be able to scale up.***

(emphasis added).

149. The foregoing statement misled investors because it created the misimpression that Unicycive was "ready" to meet manufacturing requirements and had no "problem" relating to manufacturing, when, in fact, the manufacturer Unicycive engaged for OLC, Shilpa, exhibited systemic and repeated failures to comply with FDA cGMP requirements resulting in the FDA's issuance of a Form 483 in 2017, a Warning Letter in 2020 noting a repeat violation, and an Import Alert in 2021 that remains in effect today and subjects most of Shilpa's manufactured drug products to DWPE, prohibiting their entry into the United States. This statement was not merely optimistic but directly contradicted by known, unresolved facility-level compliance failures at Shilpa that independently threatened FDA approval of the OLC NDA.

150. On June 26, 2024, Unicycive filed a current report on Form 8-K, announcing an entry into a material definitive agreement (the "Shilpa Agreement 8-K"). The Shilpa Agreement 8-K was signed by Defendant Gupta, and stated, in relevant part:

> **Item 1.01 Entry into a Material Definitive Agreement.**
>
> On June 26, 2024 (the "Effective Date"), Unicycive Therapeutics, Inc. (the "Company") entered into the First Amendment to Manufacturing and Supply Agreement with Shilpa Medicare, Ltd., an Indian corporation ("Shilpa") (the "Amendment"). The Company and Shilpa are parties to that certain Manufacturing and Supply Agreement, dated as of October 31, 2020 (the "Agreement") pursuant to which Shilpa provides certain development, manufacturing, supply and other

> CMC-related services related to the development and commercialization of oxylanthanum carbonate ("OLC"). ***The Company has entered into the Amendment in anticipation of an increased manufacturing demand for OLC.***

(Emphasis added.)

151. The foregoing statements for the reasons stated in ¶107.

152. On July 5, 2024, Unicycive filed a registration statement on Form S-3 (the "July 2024 S-3"). The July 2024 S-3 was signed by Defendants Gupta and Townsend, and incorporated the false or misleading statements contained in the 2024 10-K by stating, in relevant part:

> RISK FACTORS
>
> *Any investment in our Common Stock involves a high degree of risk. Before deciding whether to purchase our Common Stock, investors should carefully consider* ***the risks described below together with the "Risk Factors" described in our most recent Annual Report on Form 10-K*** *and any updates described in our Quarterly Reports on Form 10-Q and Current Reports on Form 8-K,* ***all of which are incorporated herein by reference****, as may be amended, supplemented or superseded from time to time by other reports we file with the U.S. Securities and Exchange Commission (the "SEC").* ***Our business, financial condition, operating results and prospects are subject to the following material risks as well as those material risks incorporated by reference.***
>
> Such risks, uncertainties and other factors that could cause actual results to differ from those projected include, but are not limited to, ***the risk factors set forth herein, risk factors under the title "Risk Factors," in our Annual Report on Form 10-K for the year ended December 31, 2023***, and any updates described in our Quarterly Reports on Form 10-Q and Current Reports on Form 8-K and elsewhere in the documents ***incorporated by reference into this prospectus and any applicable prospectus supplement***.

153. The July 2024 S-3 also incorporated the false or misleading statements contained in the 2024 10-K by stating, in relevant part:

> ***You should read*** this prospectus and ***the documents incorporated by reference completely*** and with the understanding that our actual future results may be materially different from what we currently expect. Our business and operations are and will be subject to a variety of risks, uncertainties and other factors. Consequently, actual results may materially differ from those contained in any forward-looking statements. ***Such risks***, uncertainties and other factors that could cause actual results to differ from those projected ***include***, but are not limited to, ***the risk factors set forth herein, risk factors under the title "Risk Factors," in our***

> ***Annual Report on Form 10-K for the year ended December 31, 2023,*** and any updates described in our Quarterly Reports on Form 10-Q and Current Reports on Form 8-K and elsewhere in the documents incorporated by reference into this prospectus and any applicable prospectus supplement.

154. The July 2024 S-3 also incorporates the false or misleading statements contained in the 2024 10-K by stating, in relevant part:

> INCORPORATION OF DOCUMENTS BY REFERENCE
>
> The SEC allows us to "incorporate by reference" information into this prospectus, which means that we can disclose important information to you by referring you to another document filed separately with the SEC. The documents incorporated by reference into this prospectus contain important information that you should read about us.
>
> T***he following documents are incorporated by reference into this prospectus and any applicable prospectus supplement:***
>
> • ***our Annual Report on Form 10-K for the fiscal year ended December 31, 2023, filed with the SEC on March 28, 2023;***

155. The foregoing statements misled investors for the reasons described in ¶¶131.

156. On July 15, 2024, Defendant Gupta presented on behalf of Unicycive at a session of the H.C. Wainwright Kidney Virtual Conference hosted by H.C. Wainwright Senior Biotech Analyst Ed Arce. During the session, Arce asked:

> And first question was around the clinical and regulatory updates on that program. The most recent trial just read out over 2 to 3 weeks ago. And now you are, I think, able to file the NDA. So if you could just go over where you are in the timeline for filing.

Defendant Gupta responded, in relevant part:

> [A]s it relates to the regulatory pathway, ***we were able to align with FDA*** for a product like B2 pathway. ***This trial was the last trial that was a piece of the puzzle that was missing in order for us to file it. There is no other requirement from the FDA.*** We completed the trial. We released the data. I'll talk about the data in a minute. ***But talking about regulatory pathway, we have been in discussions with the FDA. We had multiple meetings and the summary is that there is nothing is stopping us from this trial to file our NDA.***

(Emphasis added.)

157. The foregoing statement misled investors for the reasons stated in ¶¶137 and 143.

158. On August 14, 2024, Unicycive filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for its second quarter ended June 30, 2024 (the "2Q24 10-Q"). The 2Q24 10-Q was signed by Defendants Gupta and Townsend. The 2Q24 10-Q incorporated the false or misleading statements contained in the 2024 10-K by stating, in relevant part:

> You should read these financial statements and the accompanying notes ***in conjunction with the financial statements and notes thereto included in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2023***, filed with the U.S. Securities and Exchange Commission ("SEC") on March 28, 2024.

(Emphasis added).

159. The foregoing statement misled investors for the reasons stated in ¶131.

160. The 2Q24 10-Q also stated, in relevant part:

> **3. Significant Agreements**
>
> With regards to manufacturing, testing and potential commercial supply of oxylanthanum carbonate, on October 31, 2020, the Company entered into an agreement with Shilpa Medicare Ltd ("Shilpa") based in India. Pursuant to the Agreement, Shilpa provides certain development, manufacturing, supply and other CMC-related services related to the development and commercialization of oxylanthanum carbonate ("OLC").
>
> In June 2024, the Company entered into the First Amendment to Manufacturing and Supply Agreement with Shilpa (the "Amendment"). The Company has entered into the Amendment ***in anticipation of an increased manufacturing demand for OLC***.

(Emphasis added.)

161. The foregoing statement misled investors for the reasons stated in ¶107.

162. The 2Q24 10-Q also incorporated false and misleading statements from the 2024 Form 10-K, stating, in relevant part: "*The following discussion and analysis of our financial*

*condition and results of operations should be read in conjunction with our financial statements and the related notes to those statements included elsewhere in this quarterly report and* ***in our previously filed Form 10-K***." (Emphasis added.)

163. The foregoing statement misled investors for the reasons stated in ¶131.

164. The 2Q24 10-Q also stated, in relevant part, "[w]e plan to continue to use third-party service providers, including contract manufacturing organizations, to carry out our pre-clinical and clinical development and ***to manufacture and supply the materials to be used during the development and commercialization of our product candidates.***"

165. The foregoing statement misled investors for the reasons stated in ¶121.

166. Appended as exhibits to the 2Q24 10-Q were signed SOX certifications wherein Defendants Gupta and Townsend certified, in relevant part, that the 2Q24 10-Q "***does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]***"

167. The foregoing statement misled investors because the 2Q24 10-Q incorporated the false and misleading statements in the 2023 10-K, as described in ¶¶106-21.

168. On August 14, 2024, Unicycive filed a current report on Form 8-K, announcing its second quarter 2024 financial results and business updates (the "2Q24 8-K"). The 2Q24 8-K was signed by Defendant Gupta. Attached as Exhibit 99.1 was a press release that quoted Defendant Gupta as stating, in relevant part:

> Achieving successful results from our [OLC] pivotal trial was a significant milestone for the company and brings us one step closer to becoming a commercial organization . . . . Importantly, the trial confirmed tolerability of OLC in patients with hyperphosphatemia on dialysis w***hich is the final data component needed to support submission of a New Drug Application (NDA) to the FDA utilizing the 505(b)(2) regulatory pathway***. . . . . ***[W]e believe that we have completed all the necessary requirements from this pivotal clinical trial to fulfill the FDA's***

> ***requests.*** We remain on track to submit our NDA by the end of this month, and we maintain a high degree of confidence in the potential for OLC to be a best-in-class commercial product, if approved.

169. The foregoing statement is misleading for the reasons stated in ¶143.

170. The 2Q24 8-K also stated, in relevant part:

> ***There are several factors that could cause actual events to differ materially from those indicated by such forward-looking statements***. These factors include, but are not limited to, clinical trials involve a lengthy and expensive process with an uncertain outcome, and results of earlier studies and trials may not be predictive of future trial results; our clinical trials may be suspended or discontinued due to unexpected side effects or other safety risks that could preclude approval of our product candidates; risks related to business interruptions which could seriously harm our financial condition and increase our costs and expenses; dependence on key personnel; substantial competition; uncertainties of patent protection and litigation; dependence upon third parties; and ***risks related to failure to obtain FDA clearances or approvals and noncompliance with FDA regulations***. Actual results may differ materially from those indicated by such forward-looking statements as a result of various important factors, including: the uncertainties related to market conditions and ***other factors described more fully in the section entitled 'Risk Factors'*** in Unicycive's Annual Report on Form 10-K for the year ended December 31, 2023, and other periodic reports filed with the Securities and Exchange Commission.

171. The foregoing statement misled investors for the reasons stated in ¶131.

172. On September 3, 2024, Unicycive issued a press release announcing that it had submitted the OLC NDA to the FDA (the "OLC NDA Press Release"). The OLC NDA Press Release incorporated the false or misleading statements contained in the 2024 10-K by stating, in relevant part:

> ***There are several factors that could cause actual events to differ materially from those indicated by such forward-looking statements.*** These factors include, but are not limited to, clinical trials involve a lengthy and expensive process with an uncertain outcome, and results of earlier studies and trials may not be predictive of future trial results; our clinical trials may be suspended or discontinued due to unexpected side effects or other safety risks that could preclude approval of our product candidates; risks related to business interruptions, which could seriously harm our financial condition and increase our costs and expenses; dependence on key personnel; substantial competition; uncertainties of patent protection and litigation; dependence upon third parties; and ***risks related to failure to obtain FDA clearances or approvals and noncompliance with FDA regulations***. Actual results

> may differ materially from those indicated by such forward-looking statements as a result of various important factors, including: the uncertainties related to market conditions and ***other factors described more fully in the section entitled 'Risk Factors' in Unicycive's Annual Report on Form 10-K for the year ended December 31, 2023***, and other periodic reports filed with the Securities and Exchange Commission.

(Emphasis added.)

173. The foregoing statements misled investors for the reasons stated in ¶131.

174. On October 17, 2024, Defendant Gupta presented on behalf of Unicycive at a session of the Maxim Healthcare Summit hosted by analysts Jason McCarthy and Michael Okunewitch. During the session, Okunewitch asked, "could you give us an idea of what are the next key events, upcoming catalysts, and the timelines for OLC getting to market?" Defendant Gupta responded, in relevant part:

> We expect to hear back from FDA, we said early November. Once we know the response, then that will also dictate the PDUFA date. ***We expect to get an approval sometime next year.*** That approval allows us to launch the drugs, so the very near-term milestones is that feedback from FDA, PDUFA date.

(Emphasis added.)

175. The foregoing statement misled investors for the reasons stated in ¶143.

176. On November 11, 2024, Unicycive issued a press release touting that "the [FDA] has accepted the [NDA] for [OLC] and has set a Prescription Drug User Fee Act (PDUFA) target action date of June 28, 2025" (the "PDUFA Press Release"). The following day, Unicycive filed a current report on Form 8-K, signed by Defendant Gupta, attaching the press release as Exhibit 99.1. The PDUFA Press Release quoted Defendant Gupta as stating, in relevant part:

> We are thrilled with the FDA acceptance of our first NDA, a significant milestone towards our efforts to bring this important treatment option to patients with kidney disease if approved . . . . With our NDA now under review, ***we are preparing to commercialize and launch OLC in the second half of 2025, if approved***.

The PDUFA Press Release went on to describe that the NDA submission package is supported by data, including on "specifications and practices related to chemistry, manufacturing, and controls (CMC)."

177. The foregoing statement misled investors for the reasons stated in ¶139.

178. The PDUFA Press Release also incorporated the false or misleading statements contained in the 2024 10-K by stating, in relevant part:

> ***There are several factors that could cause actual events to differ materially from those indicated by such forward-looking statements.*** These factors include, but are not limited to, clinical trials involve a lengthy and expensive process with an uncertain outcome, and results of earlier studies and trials may not be predictive of future trial results; our clinical trials may be suspended or discontinued due to unexpected side effects or other safety risks that could preclude approval of our product candidates; risks related to business interruptions, which could seriously harm our financial condition and increase our costs and expenses; dependence on key personnel; substantial competition; uncertainties of patent protection and litigation; dependence upon third parties; and ***risks related to failure to obtain FDA clearances or approvals and noncompliance with FDA regulations***. Actual results may differ materially from those indicated by such forward-looking statements as a result of various important factors, including: the uncertainties related to market conditions and ***other factors described more fully in the section entitled 'Risk Factors' in Unicycive's Annual Report on Form 10-K for the year ended December 31, 2023***, and other periodic reports filed with the Securities and Exchange Commission.

(Emphasis added.)

179. The foregoing statement misled investors for the reasons stated in ¶133.

180. On November 13, 2024, Unicycive filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for its third quarter ended September 30, 2024 (the "3Q24 10-Q"). The 3Q24 10-Q incorporates the false or misleading statements contained in the 2024 10-K by stating, in relevant part:

> You should read these financial statements and the accompanying notes ***in conjunction with the financial statements and notes thereto included in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2023***, filed with the U.S. Securities and Exchange Commission ("SEC") on March 28, 2024.

(Emphasis added).

181. The foregoing statement misled investors for the reasons stated in ¶131.

182. The 3Q24 10-Q also stated, in relevant part:

> **3. Significant Agreements**
>
> With regards to manufacturing, testing and potential commercial supply of oxylanthanum carbonate, on October 31, 2020, the Company entered into an agreement with Shilpa Medicare Ltd ("Shilpa") based in India. Pursuant to the Agreement, Shilpa provides certain development, manufacturing, supply and other CMC-related services related to the development and commercialization of oxylanthanum carbonate ("OLC").
>
> In June 2024, the Company entered into the First Amendment to Manufacturing and Supply Agreement with Shilpa (the "Amendment"). ***The Company has entered into the Amendment in anticipation of an increased manufacturing demand for OLC.***

(Emphasis added.)

183. The foregoing statement misled investors for the reasons stated in ¶107.

184. The 3Q24 10-Q also stated, in relevant part: "*The following discussion and analysis of our financial condition and results of operations should be read in conjunction with our financial statements and the related notes to those statements included elsewhere in this quarterly report and* ***in our previously filed Form 10-K***." (Emphasis added.)

185. The foregoing statement misled investors for the reasons stated in ¶131.

186. The 3Q24 10-Q also stated, in relevant part, "[w]e plan to continue to use third-party service providers, including contract manufacturing organizations, to carry out our pre-clinical and clinical development and ***to manufacture and supply the materials to be used during the development and commercialization of our product candidates.***"

187. The foregoing statement misled investors for the reasons stated in ¶121.

188. Appended as exhibits to the 3Q24 10-Q were signed SOX certifications, wherein Defendants Gupta and Townsend certified, in relevant part, that the 3Q24 10-Q "***does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]***"

189. The foregoing statement misled investors for the reasons stated in ¶167.

190. On November 13, 2024, Unicycive filed a current report on Form 8-K, announcing its third quarter 2024 financial results and business updates (the "3Q24 8-K"). The 3Q24 8-K was signed by Defendant Gupta. Attached as Exhibit 99.1 was a press release quoted Defendant Gupta as stating, in relevant part:

> We are pleased with the tremendous progress we have made over the last several months highlighted by the acceptance of our [OLC NDA] ***which may result in the potential approval of our first drug in 2025*** . . . . With the NDA acceptance now behind us, we are actively preparing to commercialize OLC ***with the goal of bringing this innovative new treatment to market in the second half of 2025***.

191. The foregoing statement misled investors for the reasons stated in ¶139.

192. The 3Q24 8-K also incorporated the false or misleading statements contained in the 2024 10-K by stating, in relevant part:

> ***There are several factors that could cause actual events to differ materially from those indicated by such forward-looking statements.*** These factors include, but are not limited to, clinical trials involve a lengthy and expensive process with an uncertain outcome, and results of earlier studies and trials may not be predictive of future trial results; our clinical trials may be suspended or discontinued due to unexpected side effects or other safety risks that could preclude approval of our product candidates; risks related to business interruptions which could seriously harm our financial condition and increase our costs and expenses; dependence on key personnel; substantial competition; uncertainties of patent protection and litigation; dependence upon third parties; and ***risks related to failure to obtain FDA clearances or approvals and noncompliance with FDA regulations.*** Actual results may differ materially from those indicated by such forward-looking statements as a result of various important factors, including: the uncertainties related to market conditions and ***other factors described more fully in the section entitled 'Risk Factors' in Unicycive's Annual Report on Form 10-K for the year ended***

> ***December 31, 2023***, and other periodic reports filed with the Securities and Exchange Commission.

(Emphasis added.)

193. The foregoing statements misled investors for the reasons stated in ¶133.

194. On November 13, 2024, Unicycive filed a registration statement on Form S-3 (the "November 2024 S-3"). The November 2024 S-3 was signed by Defendants Gupta and Townsend, and incorporated the false or misleading statements contained in the 2024 10-K by stating, in relevant part:

> RISK FACTORS
>
> * * *
>
> ***You should also consider the risks, uncertainties and assumptions discussed under Item 1A, "Risk Factors," in our Annual Report on Form 10-K for the fiscal year ended December 31, 2023, filed with the SEC on March 28, 2024***, and any updates described in our Quarterly Reports on Form 10-Q, all of which are incorporated herein by reference, and may be amended, supplemented or superseded from time to time by other reports we file with the SEC in the future and any prospectus supplement related to a particular offering.

195. The November 2024 S-3 also incorporated the false or misleading statements contained in the 2024 10-K by stating, in relevant part:

> ***Risks, uncertainties and other factors that may cause our actual results, performance or achievements to be different from those expressed or implied in our written or oral forward-looking statements may be found in this prospectus and any accompanying prospectus supplement under the heading "Risk Factors" and in our Annual Report on Form 10-K for the year ended December 31, 2023 under the headings "Risk Factors" and "Business," as updated in our Quarterly Report(s) on Form 10-Q.***

196. The November 2024 S-3 also incorporated the false or misleading statements contained in the 2024 10-K by stating, in relevant part:

> Before you make an investment decision, you should read this entire prospectus and the accompanying prospectus carefully, including the risks of investing in our securities discussed under the section of this prospectus entitled "Risk Factors" and similar headings in the other documents that are incorporated by reference into this

> prospectus. You should also carefully read ***<u>the information incorporated by reference into this prospectus, including our financial statements</u>***, and the exhibits to the registration statement of which this prospectus is a part.

197. The July 2024 S-3 also incorporates the false or misleading statements contained in the 2024 10-K by stating, in relevant part:

> INCORPORATION OF DOCUMENTS BY REFERENCE
>
> The SEC permits us to "incorporate by reference" the information contained in documents we file with the SEC, which means that we can disclose important information to you by referring you to those documents rather than by including them in this prospectus. Information that is incorporated by reference is considered to be part of this prospectus and you should read it with the same care that you read this prospectus and the accompanying prospectus. Information that we file later with the SEC will automatically update and supersede the information that is either contained, or incorporated by reference, in this prospectus, and will be considered to be a part of this prospectus from the date those documents are filed.
>
> We incorporate by reference the documents listed below, all filings filed by us pursuant to the Exchange Act after the date of the registration statement of which this prospectus and the accompanying prospectus forms a part, and any future filings we make with the SEC under Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act prior to the time that all securities covered by this prospectus have been sold; provided, however, that we are not incorporating any information furnished under either Item 2.02 or Item 7.01 of any Current Report on Form 8-K:
>
> ● ***our Annual Report on Form 10-K for the year ended December 31, 2023 filed with the SEC on March 28, 2024***;

198. The foregoing statements misled investors for the reasons stated in ¶131.

199. The November Form S-3 also included, as Exhibit 1.1, an agreement between Unicycive and Guggenheim Securities, LLC, a Sale Agreement for the sales offered under the registration statement. Exhibit 1.1 stated, in relevant part, that "***[t]o the Company's knowledge, the manufacturing facilities and operations of its suppliers are operated in compliance in all material respects with all Applicable Laws and Governmental Permits.***"

200. The foregoing statement misled investors because it affirmatively stated that its suppliers, including Shilpa, operated in compliance "in all material respects with all Applicable

Laws," without disclosing that beginning no later than 2017, Shilpa exhibited systemic and repeated failures to comply with FDA cGMP requirements resulting in the FDA's issuance of a Form 483 in 2017, a Warning Letter in 2020 noting a repeat violation, and an Import Alert in 2021 that remains in effect today and subjects most of Shilpa's manufactured drug products to DWPE, prohibiting their entry into the United States.

201. The November Form S-3's Exhibit 1.1 also stated, in relevant part, that:

> None of the Company, any of its officers, directors or managing employees (as defined in 42 U.S.C. § 1320a-5(b)) or, ***to the knowledge of the Company, agents, is or has been excluded, suspended or debarred from participation in any state or federal health care program, or made subject to any pending or, to the Company's knowledge, threatened or contemplated action which could reasonably be expected to result in such exclusion, suspension or debarment:***

202. The foregoing statement misled investors because its discussion of whether its agents had been "excluded, suspended, or disbarred from participation in any state or federal health care program" triggered a duty to disclose that, due to systemic and repeated failures to comply with FDA cGMP requirements, the Company's agent Shilpa was subject to an Import Alert that remains in effect today and subjects most of Shilpa's manufactured drugs to DWPE, prohibiting their entry into the United States.

203. The November Form S-3's Exhibit 1.1 also stated, in relevant part, that:

> ***The Company (i) is and has at all times been in full compliance with all laws, statutes, rules, regulations or guidance applicable to*** the Company and the ownership, testing, development, ***manufacture***, packaging, processing, use, distribution, marketing, advertising, labeling, promotion, sale, offer for sale, storage, import, export or disposal ***of any pharmaceuticals*** or biohazardous substances, materials or any other products developed, manufactured or distributed by the Company (***including, without limitation, from the FDA***, EMA and any local or other governmental or regulatory authority performing functions similar to those performed by the FDA or EMA) (collectively, "Applicable Laws"), except as could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, (ii) ***has not received any notice of adverse finding, warning letter, untitled letter or other correspondence or notice from the FDA or any other federal, state or foreign governmental authority having authority over the Company, or its activities alleging or asserting noncompliance with any***

> ***Applicable Laws or any licenses, certificates, approvals, clearances, authorizations, permits and supplements or amendments thereto required by any such Applicable Laws (collectively, the " Governmental Permits")***, (iii) has made all filings with, the appropriate local, or other governmental or regulatory agencies or bodies that are necessary for the ownership or lease of their respective properties or the conduct of their respective businesses as described in the Registration Statement and the Prospectus, except where any failures to possess or make the same would not, singularly or in the aggregate, have a Material Adverse Effect, (iv) possesses all material Governmental Permits necessary to conduct its respective businesses as described in the Registration Statement and the Prospectus, and such Governmental Permits are valid and in full force and effect and are not in violation of any term of any such Governmental Permits, (v) has filed, obtained, maintained or submitted all material reports, documents, forms, notices, applications, records, claims, submissions and supplements or amendments as required by any Applicable Laws or Governmental Permits and that all such reports, documents, forms, notices, applications, records, claims, submissions and supplements or amendments were complete and correct in all material respects on the date filed (or were corrected or supplemented by a subsequent submission), and (vi) is not a party to any corporate integrity agreements, monitoring agreements, consent decrees, settlement orders or similar agreements with or imposed by any governmental authority. ***All Governmental Permits are valid and in full force and effect***, except where the validity or failure to be in full force and effect would not, singularly or in the aggregate, have a Material Adverse Effect. ***The Company has not received notification of any revocation, modification, suspension, termination or invalidation (or proceedings related thereto) of any such Governmental Permit and the Company has no reason to believe that any such Governmental Permit will not be renewed***. Neither the Company, nor, to the Company's knowledge, any of its respective directors, officers, employees or agents has been convicted of any crime under any Applicable Laws or has been the subject of an FDA debarment proceeding. The Company has not been nor is now subject to the FDA's Application Integrity Policy. To the Company's knowledge, neither the Company, nor any of its directors, officers, employees or agents has made, or caused the making of, any false statements on, or material omissions from, any other records or documentation prepared or maintained to comply with the requirements of the FDA or any other governmental authority.

204. The foregoing statement misled investors for the reasons stated in ¶199. The Import Alert, Warning Letter, and prior Form 483s were publicly issued FDA enforcement actions directly bearing on Shilpa's compliance status and therefore fell squarely within the Company's knowledge and disclosure obligations.

205. On December 5, 2024, Defendant Gupta presented on behalf of Unicycive at a session of the Piper Sandler Healthcare Conference hosted by Piper Sandler Senior Biotech

Analyst Yas Rahimi. As a first question, Rahimi asked, "could you talk to us about how you plan, where are you in your discussion with the agency as your PDUFA date is assigned? And how do you foresee your communications in the upcoming months?" Defendant Gupta responded, in relevant part:

> First of all, thank you for having me. Lovely to be here and talk about our company and product, and we feel very excited. ***Six months away from launching a drug*** is something that we have been working on for. . . a number of years. So, really excited to be here to talk about the drug. Specifically about the agency, we have been in communication with the FDA after filing our NDA. ***The type of communication revolve around information request, which is a routine.*** A***gency will ask, hey, can you clarify this particular dataset, which we've been doing and we anticipate to be doing so until the approval.*** As you know, we have a small clinical trial. We provided the full dataset to the agency. We do not anticipate anything big to come from here till end of June. So far everything has been going on track. And this is not a communication void as in that you submit . . . NDA and there's nothing that you hear about from agency. ***So, so far, everything being on track.***

(Emphasis added.)

206. The foregoing statement misled investors for the reasons described in ¶¶137, 143. Defendants knew at the time that "everything" was not "on track" because cGMP deficiencies at Unicycive's manufacturing vendor placed the OLC NDA at substantial risk that the FDA would determine that noncompliance precluded label discussions, causing delay or outright rejection.

207. On March 31, 2025, Unicycive filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for its FY ended December 31, 2024 (the "2024 10-K"). The 2024 10-K was signed by Defendants Gupta and Townsend. In the section titled "Risk Factor Summary," the 2024 10-K stated, in relevant part, ***"[i]f we experience problems with any of these third parties, they could delay clinical development or marketing approval of our product candidates or our ability to sell any approved products."***

208. The foregoing statement misled investors for the reasons described in ¶109.

209. In a section titled "Oxylanthanum Carbonate," the 2024 10-K stated, in relevant part:

> With regards to manufacturing, testing and potential commercial supply of oxylanthanum carbonate, on October 31, 2020, the Company entered into an agreement with Shilpa Medicare Ltd ("Shilpa") based in India. Pursuant to the Agreement, Shilpa provides certain development, manufacturing, supply and other CMC-related services related to the development and commercialization of oxylanthanum carbonate ("OLC").
>
> In June 2024, we entered into the First Amendment to Manufacturing and Supply Agreement with Shilpa (the "Amendment") ***in anticipation of an increased manufacturing demand for OLC***. Pursuant to the Amendment, we agreed to make a binding purchase order for tablets of OLC and Shilpa has agreed to deliver such order by September 30, 2025.

210. The foregoing statement misled investors for the reasons stated in ¶107.

211. In the same section, the 2024 10-K stated, in relevant part:

> *Regulatory Guidance*
>
> Unicycive is seeking approval for Oxylanthanum Carbonate from the U.S. Food and Drug Administration (FDA) through the 505(b)(2) regulatory pathway. The 505(b)(2) pathway allows for full approval of a drug using data from an approved drug with the same active moiety. The approved drug is called the Reference Listed Drug (RLD). The RLD for the Oxylanthanum Carbonate submission is Fosrenol (lanthanum carbonate). The FDA recommended conducting a BE study in healthy volunteers and a 6-month toxicity study in mice with both Oxylanthanum Carbonate and Fosrenol to be able to rely on the efficacy and safety of Fosrenol. ***We completed both studies and submitted the data for the FDA's review during the pre-NDA (New Drug Application) meeting request***. After reviewing the data, the Agency recommended that we conduct a tolerability study of Oxylanthanum Carbonate in chronic kidney disease patients on dialysis before filing the NDA. ***We gained alignment with the FDA*** on the study design, sample size, and endpoints of the proposed pivotal clinical study during a Type-C meeting in September 2023. This study was initiated in December 2023 and reported positive results in June 2024. Unicycive announced the OLC NDA submission in September 2024 and received a PDUFA date of June 28, 2025. ***In March 2025, FDA conducted a general surveillance inspection of Shilpa Medicare Ltd, where the company received one procedural observation in form 483.***

212. The foregoing statement misled investors because, having raised the subject of Shilpa's March 2025 Form 483, and selectively disclosing a single inspection, Defendants

triggered a duty to disclose that: (i) beginning no later than 2017, Shilpa exhibited systemic and repeated failures to comply with FDA cGMP requirements resulting in the FDA's issuance of a Form 483 in 2017, a Warning Letter in 2020 noting a repeat violation, and an Import Alert in 2021 that remains in effect today and subjects most of Shilpa's manufactured drug products to DWPE, prohibiting their entry into the United States; and (ii) that the FDA would not approve the OLC NDA absent resolution of its manufacturer's cGMP deficiencies. Separately, the foregoing statement misled investors for the reasons stated in ¶143.

213. In Item 1.A, Risk Factors, the 2024 10-K stated, in relevant part:

> Obtaining clearances or approvals from the FDA and from the regulatory agencies in other countries is an expensive and time-consuming process and is uncertain as to outcome. ***The FDA and*** other agencies ***could ask us to supplement our submissions, collect new CMC or non-clinical data, conduct additional clinical trials or engage in other time-consuming actions, or it could simply deny our applications.***

214. The foregoing statement is misleading for the reasons stated in ¶111.

215. In the same section, the 2024 10-K also stated, in relevant part:

> ***If we are not able to obtain, or if there are delays in obtaining, required regulatory approvals, we will not be able to commercialize, or will be delayed in commercializing, our product candidates and our ability to generate revenue will be impaired.***
>
> * * *
>
> Securing regulatory approval requires the submission of extensive pre-clinical and clinical data and supporting information to the various regulatory authorities for each indication to establish the product candidate's safety and efficacy. Securing regulatory approval also requires the ***submission of information about the product manufacturing process***, testing and release ***and inspection of manufacturing facilities and personnel by the relevant regulatory authority***. Our product candidates may not be effective, may be only moderately effective or may prove to have undesirable or unintended side effects, toxicities or other characteristics that ***may preclude our obtaining marketing approval or prevent or limit commercial use.***
>
> * * *

***In addition, varying interpretations of the data obtained from pre-clinical testing, manufacturing and product testing and clinical trials could delay, limit or prevent marketing approval of a product candidate.***

216. The foregoing statement misled investors for the reasons described in ¶111.

217. In the same section, the 2024 10-K also stated, in relevant part:

In addition, later discovery of ***previously unknown problems with our*** products, ***manufacturers or manufacturing processes and facilities or failure to comply with regulatory requirements, may result in***, among other things:
● ***restrictions on such products, manufacturers or manufacturing processes or facilities;***
● ***restrictions on*** the labeling, marketing, ***distribution*** or use ***of a product;***
● requirements to conduct post-approval clinical trials, other studies or other post-approval commitments;
● ***warning or untitled letters;***
● withdrawal or recall of the products from the market;
● ***refusal to approve pending applications or supplements to approved applications that we submit;***
● fines, restitution or disgorgement of profits or revenue;
● suspension or withdrawal of marketing approvals;
● ***refusal to permit the import or export of our products;***
● product seizure; and
● injunctions or the imposition of civil or criminal penalties.

218. The foregoing statement misled investors for the reasons described in ¶115.

219. In the same section, the 2024 10-K also stated, in relevant part:

**We intend to rely on third parties to conduct our clinical trials and to conduct some aspects of our research and pre-clinical testing and *those third parties may not perform satisfactorily*, including failing to meet deadlines for the completion of such trials, research or testing.**

We expect to rely on third parties, such as CROs (contract research organizations), ***CMOs (contract manufacturers) of clinical supplies***, clinical data management organizations, medical institutions and clinical investigators, to conduct our clinical trials and to conduct some aspects of our research and pre-clinical testing. These third parties may terminate their engagements with us at any time. ***If these third parties do not successfully carry out their duties***, meet expected deadlines or conduct our studies ***in accordance with regulatory requirements*** or our stated protocols, ***we will not be able to obtain, or may be delayed in obtaining, marketing approvals for our product candidate***s and will not be able to, or may be delayed in our efforts to, successfully commercialize our product candidates.

220. The foregoing statement misled investors for the reasons stated in ¶109.

221. In the same section, the 2024 10-K also stated, in relevant part:

**We have no experience manufacturing product candidates on a clinical or commercial scale and will be dependent on third parties for the manufacture of our product candidates. *If we experience problems with any of these third parties or their subcontractors or vendors, they could delay clinical development or marketing approval of our product candidates or our ability to sell any approved products.***

We do not have any manufacturing facilities. We expect to rely on third-party manufacturers for the manufacture of our product candidates for clinical trials and for commercial supply of any product candidate for which we obtain marketing approval.

* * *

***Third-party manufacturers may not be able to comply with U.S. cGMPs*** or similar regulatory requirements outside the United States. O***ur failure, or the failure of our third-party manufacturers, or their subcontractors, to comply with cGMPs or other applicable regulations, even if such failures do not relate specifically to our product candidates or approved products, could result in sanctions being imposed on us or the manufacturers, including*** fines, injunctions, civil penalties, ***delays***, ***suspension or withdrawal of approvals,*** license revocation, seizures or recalls of product candidates, operating restrictions and criminal prosecutions, any of which could adversely affect supplies of our product candidates and harm our business and results of operations.

* * *

***Any performance failure on the part of our manufacturers, including a failure that may not relate specifically to our product candidates or approved products, could delay clinical development or marketing approval or adversely impact our ability to generate commercial sales. If our contract manufacturers cannot perform as agreed***, we may be required to replace that manufacturer.

* * *

Furthermore, we expect to rely on third parties to release, label, store and distribute drug supplies for our clinical trials. ***Any performance failure on the part of these third parties, including a failure that may not relate specifically to our product candidates, could delay or otherwise adversely impact clinical development or marketing approval of our product candidates or commercialization of our drug, producing losses and depriving us of potential revenue. Our supplier Shilpa Medicare Ltd was reviewed by the FDA in March 2025.***

222. The foregoing statement misled investors for the reasons stated in ¶¶107, 109.

223. In the same section, the 2024 10-K also stated, in relevant part:

> **Our employees *may engage in misconduct* or other improper activities, *including noncompliance with regulatory standards and requirements*, which could cause significant liability for us and harm our reputation.**
>
> We are exposed to the risk of employee fraud or other misconduct, including intentional failures to comply with FDA regulations or similar regulations of comparable foreign regulatory authorities, provide accurate information to the FDA or comparable foreign regulatory authorities, comply with ***manufacturing standards we have established***, comply with federal and state healthcare fraud and abuse laws and regulations and similar laws and regulations established and enforced by comparable foreign regulatory authorities, report financial information or data accurately or disclose unauthorized activities to us.

224. The foregoing statement misled investors for the reasons stated in ¶119.

225. In the same section, the 2024 10-K also stated in relevant part:

> We cannot commercialize our product candidates in the United States without first obtaining approval from the FDA to market each product candidate. Our product candidates could face substantial delays or even fail to receive marketing approval for many reasons, including among others:
> • ***The FDA may decide that additional CMC***, nonclinical and clinical studies ***would be needed for the approval of Oxylanthanum Carbonate;***
> • ***the FDA may disagree with the design, implementation, or interpretation of data of our CMC***, preclinical, or clinical studies;

226. The foregoing statement misled investors for the reasons stated in ¶111.

227. In Item 7, Management's Discussion and Analysis of Financial Condition and Results of Operations, the 2024 10-K also stated, in relevant part, "***[w]e plan to continue to use third-party service providers, including contract manufacturing organizations, to carry out our pre-clinical and clinical development and to manufacture and supply the materials to be used during the development and commercialization of our product candidates.***"

228. The foregoing statement misled investors for the reason stated in ¶121.

229. Appended as exhibits to the 2024 10-K were signed SOX certifications, wherein Defendants Gupta and Townsend certified, in relevant part, that the 2024 10-K "***does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the***

***statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]***"

230. The foregoing statement misled investors because of the inclusion of false statements in the 2024 10-K, as described in ¶¶206-28.

231. On March 31, 2025, Unicycive filed a current report on Form 8-K with the SEC announcing its FY 2024 financial results and business updates (the "2024 8-K"), signed by Defendant Gupta, which included a press release as Exhibit 99.1. The 2024 8-K stated, in relevant part:

> ***There are several factors that could cause actual events to differ materially from those indicated by such forward-looking statements***. These factors include, but are not limited to, clinical trials involve a lengthy and expensive process with an uncertain outcome, and results of earlier studies and trials may not be predictive of future trial results; our clinical trials may be suspended or discontinued due to unexpected side effects or other safety risks that could preclude approval of our product candidates; our dependence on third parties for manufacturing; risks related to business interruptions, which could seriously harm our financial condition and increase our costs and expenses; dependence on key personnel; substantial competition; uncertainties of patent protection and litigation; dependence upon third parties; market acceptance of our products; and ***risks related to failure to obtain FDA clearances or approvals and noncompliance with FDA regulations***. Actual results may differ materially from those indicated by such forward-looking statements as a result of various important factors, including: the uncertainties related to market conditions and ***other factors described more fully in the section entitled 'Risk Factors' in Unicycive's Annual Report on Form 10-K for the year ended December 31, 2024***, and other periodic reports filed with the Securities and Exchange Commission.

232. The foregoing statement misled investors because it incorporated misleading warnings of hypothetical future risk from the 2024 10-K as stated in ¶¶212-26.

233. On May 14, 2025, Unicycive filed a current report on Form 8-K with the SEC announcing its first quarter 2025 financial results and business updates (the "1Q2025 8-K"), signed by Defendant Gupta, which included a press release as Exhibit 99.1. The 2024 8-K stated, in relevant part:

> ***There are several factors that could cause actual events to differ materially from those indicated by such forward-looking statements.*** These factors include, but are not limited to, clinical trials involve a lengthy and expensive process with an uncertain outcome, and results of earlier studies and trials may not be predictive of future trial results; our clinical trials may be suspended or discontinued due to unexpected side effects or other safety risks that could preclude approval of our product candidates; risks related to business interruptions, which could seriously harm our financial condition and increase our costs and expenses; our need to raise substantial additional capital in the future to fund our continuing operations and the development and commercialization of our current product candidates and future product candidates; dependence on key personnel; substantial competition; uncertainties of patent protection and litigation; dependence upon third parties; ***risks related to delays in obtaining or failure to obtain FDA clearances or approvals and noncompliance with FDA regulations; and our failure, or the failure of our third-party manufacturers, or their subcontractors, to comply with cGMPs or other applicable regulations, which could result in*** sanctions being imposed on us or the manufacturers, including fines, injunctions, civil penalties, delays, ***suspension or withdrawal of approvals,*** license revocation, seizures or recalls of product candidates, operating restrictions and criminal prosecutions, any of which could adversely affect supplies of our product candidates and harm our business and results of operations. Actual results may differ materially from those indicated by such forward-looking statements as a result of various important factors, including: the uncertainties related to market conditions and ***other factors described more fully in the section entitled 'Risk Factors' in Unicycive's Annual Report on Form 10-K for the year ended December 31, 2024,*** and other periodic reports filed with the Securities and Exchange Commission.

234. The foregoing statement misled investors for the reasons stated in ¶232.

235. The same day, Unicycive filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for its first quarter ended March 31, 2025 (the "1Q25 10-Q"). The 1Q25 10-Q was signed by Defendant Gupta and stated, in relevant part: "***We plan to continue to use third-party service providers, including contract manufacturing organizations***, to carry out our pre-clinical and clinical development and ***to manufacture and supply the materials to be used during*** the development and ***commercialization of our product candidates***."

236. The foregoing statement misled investors for the reasons stated in ¶121.

237. The 1Q25 10-Q also stated, in relevant part: "The following discussion and analysis of our financial condition and results of operations should be read in conjunction with our financial statements and the related notes to those statements included elsewhere in this quarterly report ***and in our previously filed Form 10-K.***"

238. The 1Q25 10-Q also stated in relevant part, "You should read these financial statements and the accompanying notes ***in conjunction with the financial statements and notes thereto included in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2024***."

239. The foregoing statements misled investors because they incorporated the false and misleading statements contained in the 2024 10-K, as stated in ¶¶206-28.

240. Appended as exhibits to the 1Q25 10-Q were signed SOX certifications, wherein Defendants Gupta and Townsend certified, in relevant part, that the 1Q25 10-Q "***does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]***"

241. The foregoing statement misled investor because the 1Q25 10-Q included false and misleading statements as stated in ¶¶235-39.

242. On April 7, 2025, Defendant Gupta presented on behalf of Unicycive at a session of the 24th Annual Needham Virtual Healthcare Conference, hosted by Needham biotech researcher John Jianco. In opening remarks, Defendant Gupta stated, in relevant part:

> We have two drugs in development, a lead drug Oxylanthanum Carbonate has a PDUFA date of June 28 which is this quarter towards the end of June. We have a drug that has a great commercial potential or $1 billion US market as of last year in this class of drug and ***a drug that has a derisk regulatory pathway***.

(Emphasis added.)

243. The foregoing statement misled investors for the reasons stated in ¶135.

244. The statements referenced in ¶¶106-242 were materially false and misleading because Defendants: (i) repeatedly portrayed manufacturing- and CMC-related risks as speculative or hypothetical when they had already materialized; (ii) represented that Unicycive was prepared to satisfy the FDA's manufacturing requirements; (iii) overstated the OLC NDA's regulatory prospects and approval timeline; (iv) failed to disclose that Unicycive's manufacturing readiness depended on Shilpa, a third-party manufacturer with a longstanding and escalating FDA enforcement history; and (v) failed to disclose that, as a result of Shilpa's regulatory status, Unicycive faced a materially heightened risk that the FDA would issue a CRL rather than approve the OLC NDA.

245. In addition, Defendants violated Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii) ("Item 303"), which required Unicycive to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." At the time Unicycive issued their misstatements following submission of the NDA, Defendants knew, or were reckless in not knowing, that Unicycive's reliance on a manufacturing facility with a documented history of un-remediated cGMP violations—including a prior Form FDA 483, a Warning Letter citing repeat violations, and an ongoing Import Alert subjecting the facility to detention without physical examination—created a known uncertainty regarding FDA approval of OLC. FDA regulations make clear that unresolved facility-level cGMP deficiencies can preclude NDA approval regardless of product-specific data, putting regulatory approval—and thus future revenues from OLC—at serious risk. Nevertheless, Defendants failed to disclose this known uncertainty and instead: (i) framed manufacturing and approval risks as generic or hypothetical; (ii) touted their readiness to satisfy the FDA's manufacturing and CMC

requirements; and (iii) overstated the OLC NDA's regulatory prospects and approval timeline. strength of the OLC NDA. Because OLC represented a central prospective revenue source for Unicycive, the risk that FDA approval could be delayed or denied due to existing manufacturing compliance issues was precisely the type of known trend or uncertainty Item 303 required Defendants to disclose. Defendants' omission was material because Item 303 does not permit management to withhold disclosure of a known uncertainty even if the precise timing or ultimate outcome is uncertain; rather, once management knows of an uncertainty that is reasonably likely to materially affect revenues, disclosure is mandatory.

## **The Truth Emerges**

246. On June 10, 2025, during pre-market hours, Unicycive issued a press release "announc[ing] an update on its [NDA] for [OLC] to treat hyperphosphatemia in patients with [CKD] on dialysis." The press release stated, in relevant part:

> The FDA communicated to the Company that it had identified deficiencies in cGMP compliance at a third-party manufacturing vendor (one of its CDMO's third-party subcontractors and not its Drug Substance vendor) following an FDA inspection.
>
> The FDA indicated that, given the identified deficiencies, any label discussions between the FDA and the Company are precluded. The Company has responded to all FDA information requests and expects a final decision from the FDA by the PDUFA action date of June 28, 2025.

247. On this news, Unicycive's stock price fell $3.68 per share, or ***40.89%***, to close at $5.32 per share on June 10, 2025.

248. Then, on June 30, 2025, during pre-market hours, Unicycive issued a press release announcing that the FDA had issued a CRL for the OLC NDA, which "cited deficiencies previously identified at a third-party manufacturing vendor [purportedly] unrelated to [OLC.]" The press release stated, in relevant part:

> [T]he [FDA] has issued a CRL for its [NDA] for OLC to treat hyperphosphatemia in patients with [CKD] on dialysis.
>
> * * *
>
> After submitting the NDA, and as a part of the application review and routine information requests, the FDA notified Unicycive that a third-party manufacturing vendor of its main [CDMO] was cited for deficiencies following a cGMP inspection.

249. In the press release Defendants further revealed that "the Company had previously identified a back-up third-party manufacturing vendor." While they claimed to have done so "to build redundancy into its supply chain," the compelling inference given their concealment of the substantial risk raised by Shilpa's history of cGMP noncompliance is that they knew the OLC NDA faced a material risk of delay or rejection given its reliance on Shilpa.

250. The disclosure of the CRL corrected Defendants' prior misleading statements by revealing that manufacturing risks previously described as hypothetical had, in fact, already materialized due to known compliance deficiencies at a third-party facility and by further revealing that Defendants' statements regarding the prospects for the submitted OLC NDA had omitted material risks to its approvability.

251. On this news, Unicycive's stock price fell $2.03 per share, or ***29.85%***, to close at $4.77 per share on June 30, 2025.

252. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**<u>POST CLASS PERIOD EVENTS</u>**

253. FDA routinely permits resubmission of applications following issuance of a CRL, including where approval was delayed due to manufacturing compliance issues at third-party facilities. Unicycive announced on December 29, 2025 that it had resubmitted its OLC, though the

announcement made clear that the "original third-party manufacturing vendor" had not yet "regain[ed] FDA compliance."

254. The ability to resubmit an NDA does not imply that the prior deficiencies were minor, immaterial, or unforeseeable; to the contrary, FDA regulations and guidance expressly recognize that cGMP deficiencies—even when unrelated to the drug's formulation or clinical data—can preclude approval until resolved to FDA's satisfaction.

255. Indeed, FDA's import alert framework confirms that firms may remain subject to detention without physical examination for extended periods, even while sponsors pursue remediation or alternative manufacturing arrangements. The fact that Unicycive later resubmitted the NDA (and even if the resubmitted NDA is ultimately approved) therefore does not negate the materiality of the original deficiencies, nor does it excuse defendants' failure to anticipate, monitor, and disclose the heightened manufacturing risk posed by reliance on a facility with an ongoing and reaffirmed cGMP enforcement action.

256. Indeed, one month before Unicycive's resubmission Shilpa announced that following a ten day inspection by the FDA, completed on November 21, 2025, the FDA issued *another* Form 483 citing eight inspectional observations.

## SCIENTER ALLEGATIONS

257. During the Class Period, Defendants had both the motive and opportunity to commit fraud. They also had actual knowledge of the misleading nature of the statements they made or acted in reckless disregard of the true information known to them at the time. In so doing, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of the Company's securities during the Class Period.

258. Specifically, Defendants acted with at least reckless disregard for the truth in

representing that manufacturing risks associated with OLC were hypothetical, that any risks to the approvability of the OLC NDA were hypothetical, and by touting the overall strength of the OLC NDA.

259. At the time Defendants made the challenged statements set forth above, they knew or were reckless in not knowing that Shilpa had a longstanding, unresolved, and escalating FDA enforcement history demonstrating systemic cGMP failures. Indeed, Shilpa's regulatory risk profile was publicly known and severe.

260. Shilpa's history of cGMP deficiencies includes:

- a November 2017 FDA Form 483 citing multiple quality-system failures at Shilpa's Unit IV facility (FEI 3009876430), including inadequate OOS investigations, improper invalidation of failing laboratory results, deficient complaint investigations, sterile processing failures, cleaning validation deficiencies, and weak laboratory and stability controls;

- an October 9, 2020 FDA Warning Letter to the same facility (same FEI), expressly identifying repeat cGMP violations from the 2017 inspection ***and warning that FDA could withhold approval of any new drug applications listing the facility as a manufacturer***; and

- a February 2021 FDA Import Alert 66-40 (Detention Without Physical Examination) applicable to the same establishment (same FEI), which remains in effect today, and applies to all drugs Shilpa manufactures (with limited exceptions, e.g., Azacitidine Injection) reflecting FDA's determination that the facility is not operating in compliance with drug cGMP.

261. The progression from a multi-observation Form 483 (2017) to a Warning Letter citing repeat violations (2020) to an ongoing Import Alert 66-40 (2021–present) constituted clear regulatory red flags that made the risk of further cGMP deficiencies foreseeable, not speculative.

262. These facts were publicly available, severe, and persistent, and placed Defendants on notice that Shilpa represented a heightened-risk manufacturing counterparty.

263. Indeed, pursuant to the Agreement Unicycive and Shilpa formed a joint committee containing one senior member from each company with the "requisite experience and knowledge[] to address all issues that may arise under . . . this Agreement."

264. Moreover, the Agreement provided Unicycive with the right to audit and inspect any Shilpa facilities, "including but not limited to ***all compliance and other filings applicable to Regulatory authorities***" and *required* Shilpa to "***immediately*** notify [Unicycive] of any inspections performed by any Regulatory Authority at any of the aforementioned facilities ***and the results of such inspections***."

265. The Agreement also required Shilpa to "provide all necessary data, reports, plans and documents" required by Unicycive for seeking regulatory approval, and obligated Shilpa to "obtain and maintain all regulatory approvals for its facilities and operations." The First Amendment granted Unicycive additional rights to audit and inspect Shilpa facilities.

266. It is irrelevant under FDA's regulatory framework that the Import Alert does not reference OLC specifically. Import Alert 66-40 applies to drug manufacturers that appear not to be operating in compliance with current good manufacturing practice and authorizes detention without physical examination of "all drug and drug products" manufactured at the listed establishment, subject only to expressly stated exclusions. FDA's own materials make clear that such enforcement actions are facility-based, not product-specific, and that FDA may withhold or delay approval of drug applications listing a facility that has not demonstrated sustained cGMP compliance, regardless of whether the cited deficiencies relate to a particular product. 21 C.F.R. § 314.125(b)(1), (13) (the FDA may refuse to approve an NDA where, *inter alia*: "The methods to be used in, and the facilities and controls used for, the manufacture, processing, packing, or holding of the drug substance or the drug product are inadequate to preserve its identity, strength, quality, purity, stability, and bioavailability" and/or "The methods to be used in, and the facilities and controls used for, the manufacture, processing, packing, or holding of the drug substance or the drug product do not comply with the current good manufacturing practice regulations in parts 210 and 211.") Accordingly, the existence of an active Import Alert at a facility involved in

manufacturing activities relevant to OLC constituted a material regulatory risk to OLC's approval timeline and required heightened oversight and disclosure, irrespective of whether FDA ultimately characterized the deficiencies as "unrelated" to OLC itself.

267. Thus, under FDA guidance and industry-standard quality systems (detailed above), Shilpa's checkered regulatory history required heightened, risk-based oversight by Unicycive, including more frequent audits, deeper access to investigation and CAPA data, scrutiny of subcontractors, and escalation mechanisms sufficient to detect problems before FDA intervention.

268. In the press release announcing the CRL, Defendants revealed that "the Company had previously identified a back-up third-party manufacturing vendor." While they claimed to have done so "to build redundancy into its supply chain," the compelling inference given their concealment of the substantial risk raised by Shilpa's history of cGMP noncompliance is that they knew the OLC NDA faced a material risk of delay or rejection given its reliance on Shilpa.

269. Then, after the Class Period, Defendants issued a press release on December 29, 2025 announcing their resubmission of the OLC NDA with the "original third-party manufacturing vendor," and making clear that the vendor had still not "regain[ed] FDA compliance," bespeaking the severity of the *non*compliance that precipitated the CRL.

**PLAINTIFF'S CLASS ACTION ALLEGATIONS**

270. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Unicycive securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate

families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

271. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Unicycive securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Unicycive or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

272. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

273. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

274. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Unicycive;
- whether the Individual Defendants caused Unicycive to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Unicycive securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

275. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

276. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Unicycive securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Unicycive securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

277. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

278. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

**COUNT I**

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

279. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

280. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

281. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Unicycive securities; and (iii) cause Plaintiff and other members of the Class to purchase or

otherwise acquire Unicycive securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

282. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Unicycive securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Unicycive's finances and business prospects.

283. By virtue of their positions at Unicycive, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

284. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Unicycive, the Individual Defendants had knowledge of the details of Unicycive's internal affairs.

285. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Unicycive. As officers and/or directors of a publicly held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Unicycive's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Unicycive securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Unicycive's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Unicycive securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

286. During the Class Period, Unicycive securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Unicycive securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Unicycive securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Unicycive securities declined

sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

287. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

288. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

**COUNT II**

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

289. Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

290. During the Class Period, the Individual Defendants participated in the operation and management of Unicycive, and conducted and participated, directly and indirectly, in the conduct of Unicycive's business affairs. Because of their senior positions, they knew the adverse non-public information about Unicycive's misstatement of income and expenses and false financial statements.

291. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Unicycive's financial condition and results of operations, and to correct promptly any public statements issued by Unicycive which had become materially false or misleading.

292. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Unicycive disseminated in the marketplace during the Class Period concerning Unicycive's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Unicycive to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Unicycive within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Unicycive securities.

293. Each of the Individual Defendants, therefore, acted as a controlling person of Unicycive. By reason of their senior management positions and/or being directors of Unicycive, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Unicycive to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Unicycive and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

294. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Unicycive.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: January 27, 2026

Respectfully submitted,

POMERANTZ LLP

*/s/ Tamar A. Weinrib*

Tamar A. Weinrib
(admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
taweinrib@pomlaw.com

*Lead Counsel for Plaintiff*

THE SCHALL LAW FIRM
Brian Schall
Adam Rosen
2049 Century Park East, Ste. 2460
Los Angeles, CA 90067
Telephone: (310) 301-3335
Facsimile: (213) 519-5876
brian@schallfirm.com
adam@schallfirm.com

*Additional Counsel for Plaintiff*